IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

MICHAEL NIGRO,

                                 PLAINTIFF,

          vs.

THE CITY OF NEW YORK, a municipal entity,
DEPUTY INSPECTOR ANDREW P. LOMBARDO,
RETIRED POLICE CHIEF THOMAS PURTELL,
POLICE CHIEF JOSEPH McNAMARA, POLICE
INSPECTOR JOSEPH D'ADAMO, OFFICER JOSEPH
ANIANO, and NYPD OFFICERS "JOHN  DOES 1-10"
and "Richard Roes 1-10",

                             DEFENDANTS.

_____

INDEX NO.
ECF CASE

COMPLAINT

[JURY TRIAL
DEMANDED]

Plaintiff MICHAEL NIGRO, by his attorneys, STECKLOW & THOMPSON, complaining of the defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.     Plaintiff brings this action for compensatory damages, punitive damages and attorneys' fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights.

2.     Plaintiff Michael Nigro is a fifty-two year-old award-winning filmmaker, a six-time Emmy-nominated writer-director, and a multi-media journalist, whose articles and photographs have appeared in *Rolling Stone*, *Time*, *The Guardian*, National Public Radio, among several other media outlets. Formerly, a multimedia journalist with Buzzfeed News, he is currently represented by SIPA USA, the international media agency, and regularly contributes to the publications *TruthDig* and *Huffington Post*.

3.      On March 19, 2016, the day Mr. Nigro was falsely arrested by New York City Police Department ("NYPD"), Mr. Nigro was photographing a news event. The photographs he was able to take before his arrest at this newsworthy event were uploaded and available for license and distribution for publication in newspapers and other media by Getty Images, Inc. and Pacific Press Agency, international photo news agencies, with one image licensed to a German publication and published internationally.



4.      That day, Mr. Nigro decided to cover what he understood would be a large-scale protest against then-presidential candidate Donald Trump.

5.      Approximately 2,000 protesters participated in the demonstration, which was reported on by Mr. Nigro, as well as by CBS, *The New York Post*, *Fox News*, and other media outlets.

6.      Approximately 2 hours after the demonstration had begun, Defendant POLICE DEPUTY INSPECTOR ANDREW P. LOMBARDO grabbed Mr. Nigro from where he stood on the sidewalk, camera in hand, reporting on the protest. Defendant LOMBARDO then pulled Mr. Nigro into the street, and with Defendant POLICE

2

OFFICER JOSEPH ANIANO and other defendant police officers from the New York Police Department's Strategic Response Group, arrested Plaintiff, detained him for several hours, and charged him with disorderly conduct.

7.     As a result of this false arrest, Mr. Nigro was detained in police custody for the remainder of the protest and thereby prevented from reporting on this newsworthy event.

8.     Mr. Nigro, was further compelled to appear at court to face the false charge of disorderly conduct, which was ultimately dismissed.

9.     When challenged with a decision on how to handle complaints - dealing with NYPD treatment of media, specifically photographers with and without media credentials issued by the NYPD - that were filed by social justice groups, media entities and legal scholars including: the New York Civil Liberties Union, the New York Times, the New York Post, the Daily News, Thomas Reuters, Associated Press, WABC-TV, NBC Universal, WCBS, Dow Jones & Company, New York Press Photographers Association, National Press Photographers Association, professors and students at The Global Justice Clinic at NYU Law School, The Walter Leitner International Humarn Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School, The International Human Rights Clinic at Harvard Law School, The International Human Rights and Conflict Resolution Clinic at Stanford Law School, The Civil Rights Clinic at the Charlotte School of Law, The Community Justice section of Loyola Law Clinic-New Orleans and The Constitutional Litigation Clinic at Rutgers School of Law-Newark - the City of New York chose not to properly train officers on the First Amendment rights of media, specifically photographers with and without media

credentials issued by the NYPD, during incidents involving the NYPD and interactions with the general public.

10.     This false arrest never would have occurred but for the decision made by the City of New York to not properly train NYPD officers on the First Amendment rights of media, specifically photographers, during incidents involving interactions between the NYPD and the general public.

11.     The NYPD's Strategic Response Group (SRG) was created in 2015 as a specialized unit tasked with immediate intervention duties during periods of civil unrest, terrorists incidents or other citywide emergencies (e.g., to police mass protest and terrorism).

12.     The Citywide Special Operations Bureau oversees multiple specialized police units including SRG, Emergency Service Unit, Aviation Unit, Harbor Unit, Mounted unit.

13.     On or around the date of Plaintiff Nigro's arrest, Defendant LOMBARDO was a supervising executive officer in the SRG.

14.     On or around the date of Plaintiff Nigro's arrest, Defendant D'Adamo was the Commanding Officer ("CO") of the SRG.

15.     On or around the date of Plaintiff Nigro's arrest, Defendant McNamara was the second highest ranking executive officer of the NYPD's Citywide Operations Bureau, and was a direct supervisor of the SRG, and its supervising officer Defendant LOMBARDO.

16.     On or around the date of Plaintiff Nigro's arrest, Defendant McNamara was the second highest ranking executive officer of the NYPD's Citywide Operations Bureau, and was a direct supervisor of the SRG, and its CO, Defendant D'Adamo.

17.     On the date of the incident, the Chief of Special Operations (CO) was retired Chief Thomas Purtell.

18.     Thomas Purtell was forced into early retirement in January 2018 by current commissionr Thomas O'Neil because Purtell's "philosopy was not consistent" with the current commissioner, including Purtell's vision on community policing.

19.     The Defendants failed to properly discipline and supervise Defendant LOMBARDO despite numerous, public warnings, including video, of misconduct directed at members of the general public.

20.     The false arrest never would have occurred but for the failure of the Defendants to properly discipline and supervise Defendant LOMBARDO.

21.     Defendant LOMBARDO's lack of training in proper policing of media, specifically photographers, engaged in news gathering, was a cause of the unconstitutional arrest of Plaintiff Nigro.

22.     On March 19, 2016, Mr. Nigro was at all times lawfully exercising his First Amendment-protected right to gather news on a topic of widespread public interest. Nonetheless, the Defendant POLICE OFFICERS, under the direction of Defendants City of New York, New York City Police Department, Strategic Response Group Commanding Officer Inspector John D'Adamo and Commissioner William Bratton, prevented Mr. Nigro from reporting on the protest by falsely arresting, detaining, and charging him with an offense that he never committed.

23.     Defendants violated Mr. Nigro's constitutional rights and caused harm to Plaintiff, that continues to today, as a direct result of those constitutional violations.

## II. JURISDICTION

24.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First and Fourth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4).

## III. VENUE

25.     Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) because the claims arose in this district.

## IV. JURY DEMAND

26.     Plaintiff MICHAEL NIGRO respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

27.     Plaintiff MICHAEL NIGRO (the "Plaintiff") is a resident of the State of New York and the County of Kings.

28.     Defendant THE CITY OF NEW YORK ("Defendant CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

29.     Defendant THE CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), acting under the direction and supervision of the aforementioned municipal corporation, Defendant CITY.

6

30.    At all times relevant herein, Defendant POLICE DEPUTY INSPECTOR ANDREW P. LOMBARDO ("Defendant LOMBARDO") was a duly sworn police deputy inspector of the NYPD and was acting under the supervision of said department and according to his official duties. On information and belief, at all relevant times, Defendant LOMBARDO was assigned in a supervising capacity within Defendant NYPD's Strategic Response Group. Plaintiff sues Defendant LOMBARDO in both his official and individual capacities.

31.    At all times Defendant POLICE OFFICER JOSEPH ANIANO (Tax Identification No. 948620; Badge No. 106) is a duly sworn police officer of the New York City Police Department assigned to the B-1 Squad of the Strategic Response Group 3 and was acting under the supervision of said department and according to his official duties.

32.    At all times relevant herein, Defendant POLICE INSPECTOR JOHN D'ADAMO was a duly sworn police inspector of the NYPD and was the commanding officer and a supervisor of Defendant LOMBARDO, acting under the supervision of said department and according to his official duties. On information and belief, at all relevant times, Defendant D'ADAMO was assigned in a command capacity over Defendant NYPD's Strategic Response Group. Plaintiff sues Defendant D'ADAMO in both his official and individual capacities.

33.    At all times relevant herein, Defendant POLICE CHIEF JAMES McNAMARA was a duly sworn police deputy inspector of the NYPD and was acting under the supervision of said department and according to his official duties. On information and belief, Defendant McNAMARA is assigned in a command capacity in

the CITYWIDE OPERATIONS BUREAU that oversaw the Defendant NYPD's Strategic Response Group. Plaintiff sues Defendant McNAMARA in both his official and individual capacities.

34.    At all times relevant herein, Defendant RETIRED POLICE CHIEF THOMAS PURTELL was a duly sworn police Chief of the NYPD and was acting under the supervision of said department and according to his official duties. On information and belief, Defendant PURTELL was assigned in a command capacity in the CITYWIDE OPERATIONS BUREAU that oversaw the Defendant NYPD's Strategic Response Group. Plaintiff sues Defendant PURTELL in both his official and individual capacities. Defendants PURTELL, D'ADAMO and McNAMARA are collectively referred to as the Supervising Defendants herein.

35.    At all times Defendant POLICE OFFICER "John Does 1-10" were duly sworn police officers of the New York City Police Department and was acting under the supervision of said department and according to their official duties.

36.    At all times Defendant POLICE OFFICER Supervisors "Richard Roes 1 – 10" were duly sworn police officers of the New York City Police Department with supervisory authority and acting under the supervision of said department and according to their official duties.

37.    Plaintiff MICHAEL NIGRO sues each of the Defendant POLICE OFFICERS "John Does 1 and 2" and "Richard Roes 1-10" in both their official and individual capacities and will amend this complaint to identify each of the "John Doe" police officers by their true names, as their identities can be established to a reasonable certainty.

38.     At all times relevant to this action, the Defendant POLICE OFFICERS either personally or through their employees, were acting under color of state law and/or pursuant to the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

39.     Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK.

## VI. FACTS COMMON TO ALL CLAIMS

40.     Plaintiff Michael Nigro is a media professional whose notable career as a writer, director, photographer, and print journalist spans over two decades.

41.     Mr. Nigro, formerly a multimedia journalist with Buzzfeed News, is currently represented by SIPA USA, an international media agency and is directing his own documentary film.

42.      Plaintiff's previous feature documentary films have been selected for film festivals and theatrical release.

43.     Over the years, Mr. Nigro has also been nominated for six Emmy awards, three for writing and three for directing, for his television work.

44.     In 2015, Mr. Nigro was awarded the Art & Activism Prize by the Theo Westtenberger Estates for coverage, as a photographer and writer, of protests in the United States regarding climate change, police brutality, and other social justice issues.

45.     In 2016, Mr. Nigro was shortlisted for the D&AD International Next Photographer award for his photojournalism series "Escape From Freedom" on anti-police brutality protests in New York City.

46.     One of Mr. Nigro's photographs from the "Escape from Freedom series,

which is featured on the D&AD website at https://www.dandad.org/awards/next-

awards/2016/next-photographer/67/escape-from-freedom/ and reproduced below,

captures Defendant LOMBARDO at a large protest on April 29, 2015, pointing

aggressively at a Black man standing before him with his baton raised overhead. This



photo was taken and promoted approximately 11 months before Defendant

LOMBARDO's arrest of Plaintiff Nigro.

47.     Since 2011, Mr. Nigro has regularly reported on protests in addition to his

filmmaking. His photographs and writing on such events have appeared in *Vice*, *The*

*Guardian*, *The Intercept*, National Public Radio, *Rolling Stone*, *Time*, *Huffington Post*,

and several other media outlets.  He is now signed with Reuters as a photo journalist, and

has covered numerous press issues including the Charlottesville protest where he was one

of the first people to be impacted by the vehicle that killed Heather Heyer (see photo



below).

48.     During the 2016 Presidential election, he traveled to over a dozen states,

and recently spent nearly a month in Tijuana covering the border issues.



49.     On March 19, 2016, Mr. Nigro, along with a multitude of other journalists,

reported on a mass protest in New York City against then-Republican candidate Donald

Trump.

50.     However, Mr. Nigro's reporting on the protest was cut short by

defendants, who without legitimate cause, arrested Mr. Nigro.

51.     The protest began at 12 pm with a rally at Columbus Circle and ended, after a march through midtown Manhattan, at approximately 4 pm with a closing rally at Columbus Circle.

52.     As is visible in Mr. Nigro's photographs from the protest, reproduced below, NYPD assigned a significant number of officers to police the protest, including members of the SRG.

53.     Early, just after the march stepped began, Mr. Nigro took the photograph below at the intersection of 59th Street and 6th Avenue at the edge of Central Park. Mr. Nigro licensed this photograph, and others he took at the protest, to Getty Images, which licenses Mr. Nigro's photographs to media and other customers.



54.     Mr. Nigro took the next striking image on 57th Street between 5th and Madison Avenues. Several other photojournalists are seen in the street, while the bulk of the protesters are marching on the sidewalk. This image was published internationally, see



paragraph 3.

55.     Defendant LOMBARDO is visible in the photograph above in the fourth row of NYPD officers, walking along the white dotted line on the south side of 57th Street.

56.     Mr. Nigro took the next photograph moments later, just as Defendant LOMBARDO, an SRG Captain, and a third SRG officer arrested a photographer. (The caption to the left of the image on the Getty Images' page incorrectly identifies the arrestee as a protester.)



57.     On information and belief, this was the first arrest at the protest.

58.     After taking photographs of this arrest, Mr. Nigro moved with the march as it turned south on Madison Avenue between 57th and 56th Streets.

59.     At this time, Mr. Nigro walked south on the west side of Madison Avenue on the sidewalk.

60.     At approximately 1:30 pm, Defendant LOMBARDO entered the sidewalk, ran up to Mr. Nigro, grabbed him by the neck, and with the assistance of Defendant

ANIANO, forced Mr. Nigro from the sidewalk into the crosswalk on the north side of 56th Street at Madison Avenue.



61.     A photograph of the initial moments of Mr. Nigro's arrest is reproduced below. (The photographer of this image is unknown.)

62.     Immediately before this arrest, Defendant LOMBARDO had the opportunity to observe Mr. Nigro reporting on the protest as a photojournalist, since Defendant LOMBARDO was photographed by Plaintiff on 57th Street minutes before he arrested Plaintiff.  See paragraph 56 and related image.

63.     Mr. Nigro was also easily identifiable as a professional photographer covering the protest. He was carrying a professional-style single-reflex lens camera with a large lens and was, as Defendant LOMBARDO had the opportunity to observe, photographing the event.

64.     Although Mr. Nigro did not have a DCPI NYPD issued Press Pass on the date of his arrest, he was working that day as a professional photographer, and in light of

his continued work as a professional photographer, he has since been issued an NYPD Press Pass (see image below).



65.     As evidenced above by the Image associated with paragraph 46 above, Defendant LOMBARDO had also encountered Plaintiff acting as photojournalist at a previous protest, when Plaintiff had previously photographed Defendant LOMBARDO at close range.

66.     On information and belief, Defendant LOMBARDO singled out Mr. Nigro for arrest because he was documenting this newsworthy event.

67.     On information and belief, Defendant LOMBARDO chose to arrest Mr. Nigro precisely because he was a photographer or, alternatively, elected to disregard that Mr. Nigro was visibly engaging in legitimate and constitutionally-protected news-gathering immediately before Defendant LOMBARDO arrested him.

68.     The Defendants failed to properly discipline and supervise Defendant LOMBARDO despite numerous, public warnings, including video, of misconduct directed at members of the general public.

69.     The false arrest never would have occurred but for the failure of the Defendants to properly discipline and supervise Defendant LOMBARDO.

70.     Notably, moments before Defendant LOMBARDO arrested Mr. Nigro, he had arrested another photographer.

71.     Onlookers to the arrest shouted "He is a journalist!" to Defendant Officers as they apprehended Plaintiff.

72.     Defendant LOMBARDO and the other defendants herein had no lawful reason to arrest Plaintiff.

73.     A photograph of Defendant ANIANO placing Plaintiff into handcuffs is reproduced below. (This photograph is attributed to AP Photo/Mary Altaffer.)



74.     On information and belief, while arresting Plaintiff, Defendant LOMBARDO and Defendant ANIANO forced Mr. Nigro from the sidewalk into the street in an attempt to justify charging Mr. Nigro with disorderly conduct.

75.     At no relevant time did Mr. Nigro engage in any conduct that would rise to probable cause for his arrest and/or justify his being charged with disorderly conduct.

76.     NYPD transported Mr. Nigro to One Police Plaza following his arrest.

77.     Plaintiff was held in NYPD custody for approximately 6 hours before he was released with a Desk Appearance Ticket for Disorderly Conduct, even though he had not committed that offense.

78.     By the time he was released at approximately 6:30 pm, from a location more than 5 miles from protest site, Plaintiff was unable to continue reporting on the protest, which had ended at approximately 4:00 pm at Columbus Circle.

79.     As a result of the false arrest, Mr. Nigro was unable to report on over two-and-a-half hours of the newsworthy protest.

80.     This arrest was effectuated by members of the NYPD's SRG.

81.     Defendant D'ADAMO was the commanding officer of the SRG at the time of this arrest, and was responsible for supervising all officers

82.     At a protest like the one at which Mr. Nigro was arrested, he can snap up to 1000-1500 photographs.  The key is for Mr. Nigron to file them to an intake news desk quickly so that news outlets can purchase them.  An arrest removes Mr. Nigro from hours of work, and the images he has taken prior to the arrest, may be delayed to the point of losing any intrinsic commercial value.

83.     On or about May 2, 2016, Mr. Nigro appeared at court to answer the false charge made against him.

84.     At this appearance, Mr. Nigro accepted an offer of adjournment in contemplation of dismissal for the charge, which was dismissed on or about November 1, 2016.

85.     Plaintiff is professionally known for and possesses unique skills and artistry for reporting on protests.

86.     As a result of the above unlawful conduct, Plaintiff was caused to suffer violation of his civil rights, loss of liberty, and other special damages.

**Facts For Failure to Train & Failure to Supervise**

87.     As early as 1977, the City acknowledged that individuals are free to photograph police activity so long as the photography does not "directly endanger" an officer or another person.  This language was part of a City of New York, Federally "so-ordered" consent decree, in Black v. Codd, 73 Civ 5283 (JMC). The terms of that consent decree were incorporated into the NYPD's Patrol Guide.

88.     In March 2005, the City had entered into a settlement, in Ya-Ya Network v. City of New York, 03CV8351 (DLC), acknowledging that public sidewalk near schools are appropriate locations for the full range of First Amendment activity.

89.     The NYPD arrested numerous journalists during the Occupy Wall Street demonstrations in 2011 and 2012.  In a single instance, the NYPD arrested at least ten people for attempting to take video or photographs when the NYPD cleared Zuccotti Park of protestors.

90.     In 2011, the NYPD issued a Finest Message concerning the rights of journalists to cover police interactions and incidents without arrest, however, these

messages did not involve any update to the training that members of the NYPD or the Strategic Response Group receive concerning the rights of media at police incidents.

91.     The NYPD has a unit that is in charge of media relations, including the issuance of press credentials, the Public Information Division ("DCPI").

92.     In 2011, Detective Gin Sarubbi in the office of the DCPI sated that "We aren't issuing press credentials to reporters covering Occupy Wall Street."

93.     In 2011, the Commanding Officer of DCPI was Assistant Chief Kim Royster.

94.     In the lawsuit of *Poo Soto v. City of NY, et al,* 13CV8474(LTS), Asst. Chief Royster was deposed on September 28, 2015, in a transcript available publicly on the docket as entry 84-10.

95.     Asst. Chief Royster testified that DCPI was aware of numerous complaints made to the NYPD regarding the NYPD's treatment of journalists covering Occupy Wall Street events.

96.     Asst. Chief Roytser testified that "there wasn't any data compiled" regarding the number of complaints made about NYPD treatment of the press who were covering Occupy Wall Street.

97.     In a lawsuit involving photographer J.B. Nicholas (see paragraphs ___), an attorney for the City of New York stated to federal Judge J. Paul Oetken that there is no written standard for summarily revoking a journalist's credentials.

98.     DCPI conducts a 90 minute training on media relations for members of service.  Provision of this training began in 2010.  Each training session includes from 20 to 200 officers.

99.     DCPI does not keep a record of which officers are trained.

100.    Prior to November 23, 2011, DCPI provided training in media relations to no more than 900 officers.

101.    In 2012, DCPI provided training in media relations to between one and two thousand officers.

102.    At that time, there were approximately 35,000 uniformed members of the NYPD.

103.    Asst. Chief Roytser has testified that the only written materials used to ensure that members of service complied with NYPD policy to protect freedom of the press were "patrol guide procedures that deal with breaking news events, media relations, how to deal with the media at an event and instructions on what is censorship and how to protect the First Amendment."

104.    Asst. Chief Roytser has testified that she is unaware of any specific officer who has been investigated for failure to follow NYPD policy regarding media relations and protection of the First Amendment.

105.    Asst. Chief Roytser testified that she is aware of only one officer who was disciplined for failing to follow those policies, and that the discipline consisted of retraining.

106.    Asst. Chief Roytser testified that members of the press who are not issued press credentials by the NYPD are simply members of the public.

107.    Asst. Chief Roytser testified that DCPI media relations training applies only to members of the press who are issued press credentials by the NYPD.

108.    Asst. Chief Roytser testified that if a journalist does not carry a credential issued by the NYPD, DCPI cannot validate whether that person is actually a member of the media.

109.    Asst. Chief Roytser testified that if a journalist who has been issued a press credential issued by the NYPD is arrested, a report is automatically made to the DCPI for the purpose of revoking the press credential.

110.    The continued improper policing of media, including photographers, at police incidents has been documents since at least the Republican National Convention of 2004 and during Occupy Wall Street in 2011 and 2012, and thereafter, up to and including, the date of Mr. Nigro's arrest that is the subject of this complaint.

111.    Specifically, in the early hours of November 15, 2011, the NYPD sought to clear Zuccotti Park and held all media in a cordoned off area a distance away from the park.

112.    On November 21, 2011, the New York Civil Liberties Union ("NYCLU")
sent a letter to NYPD Commissioner Raymond Kelly and Mayor Michael Bloomberg
about the NYPD conduct towards media on November 15, 2011.  Within this letter, the
NYCLU that stated in part, "as you undoubtedly are aware, there have been many public
accounts of reporters, photographers, and other journalists being mistreated and subjected
to physical force during OWS protests and further of over 25 journalists being arrested."

113.    On November 21, 2011, the New York Times, the New York Post, the
Daily News, Thomas Reuters, Associated Press, WABC-TV, NBC Universal, WCBS,
Dow Jones & Company, New York Press Photographers Association, National Press
Photographers Association submitted a letter ("Media letter") to the NYPD that set out
examples of police behavior that violated NYPD policy and procedures concerning media
on or about November 15, 2011 during police interaction with the public while clearing
Zuccotti Park.

114.    This Media letter included an example of a credentialed photographer
being threatened with arrest for being inside Zuccotti Park.

115.    This Media letter included an example of a credentialed press
photographer who was given inconsistent instructions by the NYPD about where to stand
and eventually thrown to the ground by a member of the NYPD sufficient to have the
photographers head hit the pavement.

116.    Another example was a group of photographers being physically pushed
back by a large police officer, forcing a reporter to fall backwards onto her elbow and
resulted in her yelling in pain.  The officer picked this journalist up by the collar while

screaming "stop pretending."  The reporter was taken to Bellevue Hospital for treatment of her injuries.

117.    Another example was of a photographer seeking to take a photograph of a bloodied individual being removed by the NYPD from Zuccotti Park.  At the time that the photographer raised his camera to take the photo, two members of the NYPD lunged at the photographer with a metal barrier striking the photographer in the chest, knees and shin.  The members of the NYPD yelled that the photographer was "not permitted to take photographs on the sidewalk – the most traditionally recognized public forum aside from a park."

118.    This letter also identified a meeting, in August 2011, between the NYPD and members of the media, wherein it had been "agreed that additional training to reinforce media guidelines" was needed and appropriate for members of the NYPD.

119.    On information and belief, another meeting was held between these members of the media and high ranking members of the NYPD on or about November 23, 2011.

120.    After this November 23, 2011 meeting, the NYPD Commissioner issued a FINEST message "to remind members of the service of their obligations to cooperate with media representatives acting in a news-gathering capacity at the scene of police incidents."

121.    As the above paragraphs set out, this conduct to limit access of members

of the media, including photographers, from the sight and sound of police incidents has

persisted since Occupy Wall Street.

122.    During Occupy Wall Street numerous photographers were arrested

covering protest activity.

123.    Among the photographers arrested were Stephanie Keith on October 1,

2011; Justin Bishop on November 15, 2011; Jared Maslin on November 15, 2011;

Charles Meacham on December 12, 2011 and September 15, 2012; Julia Reinhart on

September 17, 2012, Timothy Eastman on September 17, 2012.

124.    International human rights and U.S. civil liberties experts from law

schools across the United States banded together and created the *Protest and Assembly

Project*, which in turn released the comprehensive and damning report entitled

*Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall

Street* on July 21, 2012.[1]

125.    The Suppressing Protest Report documented numerous violations of the

NYPD against photographers, such as violence against a credentialed photographer on

December 31-January 1 (page 74); arrests of photographers (page 85-86); a summary

number of 44 arrests by the NYPD of journalists during Occupy Wall Street (page 87 and

footnote 115); physical abuse of journalists by the NYPD (page 88); other obstructions of

---

[1]The Global Justice Clinic (NYU School of Law), Walter Lestner Int'l Human Rights
Clinic (Fordham Law School), *Suppressing Protest: Human Rights Violations in the U.S.
Response to Occupy Wall Street* (July 21, 2012). Hereafter, referred to as the
"Suppressing Protest Report".

press freedoms (page 89); pepper spary of FOX 5 photographer Roy Isen on October 5, 2011 (Appendix #22); and other improper conduct towards photographers (Appendix I ##40, 56, 61, 66, 79, 80, 81, 92, 99, 103.

126.    In August 2012, the general counsel for the National Press Photographers Association wrote to the NYPD concerning improper treatment of photo journalist Robert Stolarik.  The letter documented various dates and incidents wherein members of the NYPD violated the NYPD Patrol Guide directives and the previous FINEST message in mistreatment of photographers by the NYPD.

127.    On August 4, 2012, an NYPD officer falsely arrested a photographer for the New York Times, Robert Stolarik, who was photographing an arrest in the Bronx as part of a story on the NYPD's "stop and frisk" policy.

128.    When Mr. Stolarik attempted to photograph the arrest, he was confronted aggressively by NYPD officers.  The arresting officer claimed that Mr. Stolarik repeatedly discharged a camera flash in his face.

129.    Mr. Stolarik was charged with obstructing government administration and resisting arrest.

130.    Mr. Stolarik's camera was shown not have a flash.  All charges against him were dropped.  The officer who arrested Mr. Stolarik was convicted of a felony of offering a false instrument for filing.

131.     On August 6, 2012, the General Counsel of the National Press Photographer's Association (NPPA) wrote to the NYPD Deputy Commissioner of Public Information (DCPI) Robert Brown concerning the arrest of Mr. Stolarik.

132.     The August 6, 2012 NPPA letter also recounted incidents of NYPD interference with press photographers on November 24, 2011 at the scene of a fire in Brooklyn and at the Macy's Thanksgiving Day Parade in Manhattan; in December 2011 at an Occupy Wall Street protest.

133.     Between December 2011 and August 2012, the General Counsel of the NPPA sent to Deputy Commissioner Brown information regarding other incidents of NYPD interference with photojournalists.  Deputy Commissioner Brown did not respond.

134.     On October 9, 2014, the NYCLU sent a letter to NYPD Commissioner Bratton alerting the NYPD that NYPD School Safety Agents had interfered with and prevented a New York One journalist from videotaping students and School Safety Agents in front of a school.

135.     The October 9, 2014 letter informed the NYPD that as a journalist was standing on a public sidewalk across the street from a school and filming students and School Safety Agents in front of a school, a Safety Agent ordered the journalist to stop filming; that when the journalist objected, the Safety Agent broke the lens guard off the camera and then covered the lens with the her hat, preventing the journalist from filming.

136.     The October 9, 2014 letter informed the NYPD that at least two additional and similar incidents involving NYPD officers ordering and preventing New York One

journalists in front of schools.

137.   The October 9, 2014 letter informed the NYPD that these incidents suggests "a crucial need to train School Safety Agents in their obligations to respect First Amendment rights on the public sidewalk."

138.   J.B. Nicholas was a professional photojournalist with an NYPD-issued press pass. On numerous occasions, Mr. Nicholas' pass was confiscated when he was photographing police activity without interfering or endangering an officer or anyone else.  These include, among other instances, in 2007 at Yankee Stadium; in July, 2014 at the Broadway-Lafayette subway station; in 2015 at the scene of a building collapse in midtown.

139.   During the 2014 incident, when Mr. Nicholas attempted to take a photograph, he was told he would be arrested if he did not leave the station platform.  At the same time, bystanders were allowed to remain on the platform.

140.   Mr. Nicholas has been arrested several times while performing his job as a credentialed photojournalist with an NYPD-issued press pass.

141.   Mr. Nicholas was arrested while photographing paramedics in 2013.  He was acquitted in the trial of those charges.

142.   Mr. Nicholas was arrested in 2014 while attempting to photograph NFL Commissioner Roger Goodell.  All charges were dropped against him.

143.    The CCRB substantiated 96 cases of police interference with civilians

recording police activity between January 1, 2014 and December 31, 2016.  The CCRB

substantiated cases involving improper threats to arrest people recording police activity;

using physical force to improperly prevent the recording of police activity; improperly

beating people who had recorded police activity; improperly blocking and preventing

people from recording police activity; improperly searched recording devices for

recordings of police activity; improperly deleted recordings of police activity; damaging

and destroying recording devices; and arresting and issuing summonses in retaliation for

civilian recording of police activity.

144.    Regulations state that the NYPD must hold a hearing to revoke a

journalist's press credentials.  In a hearing related to a suit brought by Mr. Nicholas, a

City lawyer stated to federal Judge J. Paul Oetken that he was unaware whether such

hearings are held.

*The City's deliberate indifferent to the misconduct of Inspector LOMBARDO*

145.    The City has failed to properly discipline and supervise Defendant

LOMBARDO even though it has known that such discipline and supervision is necessary

to prevent the further violation of constitutional rights of people of the City of New York.

146.    Defendant LOMBARDO has been the subject of various misconduct

allegations and complaints, including unlawful arrest and excessive force during

improper arrests.  This includes, but is not limited to a complaint filed by attorney M.J.

Williams with the CCRB accusing LOMBARDO of using excessive force, punching her

and accidentally brushing her breast as he and other offices arrested her (this incident occurred after the arrest of Mr. Nigro).

147.    Defendant LOMBARDO has been named as a defendant in at least three lawsuits alleging that he committed constitutional violations as an NYPD Officer.

a.    *Adsluf v. City of New York*, et al, 13CV02295(LGS).

b.    *Lynch and Rye v. City of New York,* et al, 16CV7355(LAP).

c.    *Ledlum v. City of New York, et al,* 07CV107 (ERK)(JMA).

148.    In addition to these lawsuits and internal investigations, complaints about Defendant LOMBARDO have been reported publically at least since 2011.

149.    Defendant LOMBARDO has been named as the NYPD's Most Notorious Anti-Activist Cop.  See, e.g., Gothamist, Sep 23, 2015, "From Abu Ghraib To Black Lives Matter: Meet The NYPD's Most Notorious Anti-Activist Cop," by Adam Johnson & Keegan Stephan, viewable at http://gothamist.com/2015/09/23/abu_ghraib_cop_lombardo.php .

150.    At other times, Defendant LOMBARDO has been caught on camera using vulgar language threatening peaceful activists.  See https://www.youtube.com/watch?v=2xN3e-xXtXw (around 2.25, Defendant LOMBARDO can be heard stating, "Close your fucking face, I'm going to find 20 fucking things to put you in jail, don't be an asshole.").

151.    On or about September 23, 2015, it was publicly reported, via Twitter, that Defendant LOMBARDO had threatened activist Jose LaSalle by telling him, "I'm going to take you somewhere no one can find you."  Making good on this promise, Defendant LOMBARDO then arrested Mr. LaSalle and drove him to a precinct far from the arrest location.

152.    Despite these various complaints against Defendant LOMBARDO, both publicly and via litigation, Defendant LOMBARDO has been repeatedly promoted, to Captain in 2011 and to Deputy Inspector in 2015.

153.    At the time relevant to the incident underlying this complaint, Defendants D'Adamo, McNamara and Purtell were each supervisors of Defendant LOMBARDO, either direct supervisors or, supervisors of a supervisor of Defendant LOMBARDO.

154.     The injuries suffered by Plaintiff Nigro are the result of the Defendant City of New York, D'Adamo, McNamara and Purtell's failure to properly supervise and discipline Defendant LOMBARDO.

155.    In fact, both Defendant McNamara and Purtell have each been sued for violating the constitutional rights of individuals and making false arrests at protest.  See *Koznar v. City of New York,* 15CV1484(SAS)(Suit naming McNamara as a defendant for directing false arrest of individual in and around Zuccotti Park on February 29, 20120); *Boss v. City of New York*, 12CV8728(GBD)(Suit naming Purtell as a defendant for tackling, kneeing and falsely arresting a journalist named Joshua Boss on December 17, 2011).

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. §**
**1983**

156.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs.

157.    All of the aforementioned acts of the Defendant CITY, Defendant PURTELL, Defendant McNAMARA, Defendant LOMBARDO, Defendant ANIANO and Defendants "John Doe" and "Richard Roe" POLICE OFFICERS and their agents, servants and employees ("Defendants"), were carried out under the color of state law.

158.    All of the foregoing acts by Defendants deprived Plaintiff of federally protected rights, including, but not limited to, the right:

a.    To be free from seizure and arrest not based upon probable cause;

b.    To freedom from being subjected to false criminal charges by the police;

c.    To freedom from abuse of process; and

d.    To freedom of speech and expression.

159.    All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First and Fourth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

160.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers under the color of state law, with all of the actual and/or apparent authority attendant thereto.

161.    As a result of the Defendants impermissible conduct, the Plaintiff suffered damages as alleged and demands judgment against the Defendants in an amount to be determined at trial, along with punitive damages, together with attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**FALSE ARREST UNDER 42 U.S.C. § 1983**

162.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs.

163.    Plaintiff was arrested by the Defendant POLICE OFFICERS without probable cause, without a warrant, and without Plaintiff's consent.

164.    In particular, the Defendant POLICE OFFICERS, including LOMBARDO and ANIANO seized Plaintiff.

165.    The Defendant POLICE OFFICERS unlawfully detained Plaintiff in their custody for approximately six (6) hours on March 19, 2016.

166.    On or about May 2, 2016, Mr. Nigro was required to appear at court to answer the charge made against him.

167.    At that appearance, the New York County District Attorney's Office offered Mr. Nigro adjournment in contemplation of dismissal of said charge.

168.    Mr. Nigro accepted that offer and the charge was thus dismissed on or about November 1, 2016.

169.    As a result of the Defendants impermissible conduct, the Plaintiff suffered damages as alleged and demands judgment against the Defendants in an amount to be determined at trial, along with punitive damages, together with attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
### *MONELL* CLAIM  UNDER 42 U.S.C. § 1983
### AGAINST THE DEFENDANT CITY OF NEW YORK

170.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

171.   All of the acts and omissions by the individual defendants described above were carried out pursuant to policies and practices of the Defendant CITY which were in existence on March 19, 2016 and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant CITY and its agency, the NYPD, and Supervising Defendants.

172.   Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts and omissions; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

173.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the Defendant CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

174.   The aforementioned customs, practices, procedures and rules of Defendant CITY and the NYPD include, but are not limited to, (i) arresting individuals in retaliation for reporting on, photographing or otherwise documenting the conduct of government actors, particularly police officers; and (ii) arresting members of the press attempting to document protests or other police activity; and (iii) failing to properly train officers in rights of media, specifically photographers with or without NYPD issued credentials.

175.   The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the paragraphs above, that include, but are not limited to the following incidents and events:

a.      May 30, 2007: A Manhattan photographer, Robert Carneval, was arrested after filming NYPD officers as they seized and loaded bicycles, which had been locked to lampposts and parking meters, into a police van. After the photographer began filming and discussing the seizure with an onlooker, a plainclothes officer asked him for identification. When the photographer stated he had the right to film, the officer led him to a police car, examined his identification, then arrested him.

b.       September 24, 2011: A journalist state that NYPD officers threw him against a wall while he was attempting to interview protesters. The journalist claimed that at the time of this incident he was holding a microphone and was wearing a badge that identified him as press.

c.      September 24, 2011: A journalist who had been arrested at a protest reported that while he was in NYPD custody that he met a woman who was arrested after she took a picture of the same protest.

d.      October 14, 2011: A journalist stated he was struck in the shoulder while taking a video without warning by an NYPD detective wearing a suit.

e.      November 15, 2011: A reporter stated that she witnessed NYPD officers throwing another reporter in a choke-hold at a protest and witnessed other NYPD officers at the same protest failing to distinguish between press and protesters.

f.      November 17, 2011: A reporter, who claimed she was visibly wearing a press pass at the time of the incident, stated that an NYPD officer struck her in the arm with a baton as she attempted to film officers as they were pushing a barricade into protesters.

g.      November 17, 2011: A reporter stated that another reporter covering a protest was slammed against a wall, arrested, and removed from the protest in handcuffs.

h.       November 2011: Several news and media organizations, including The New York Times, the New York Post, the New York Daily News, the Associated Press, NBC Universal and WNBC-TV, WCBS-TV, WABC-TV, and Thomson Reuters, wrote a letter to the NYPD to complain about deteriorating NYPD-press relations in light of NYPD's arrests of, physical assault of, and interference with or obstruction of journalists covering protests.

i.      November 23, 2011: NYPD issued a Finest Message to its members of service reminding them of their obligation to cooperate with media representatives acting in a news-gathering capacity at the scene of police incidents, citing to provisions in the NYPD Patrol Guide requiring said cooperation.

j.       December 12, 2011: Citizen reporters, who were documenting a police response to a protest in the Winter Garden of One Financial Center were grabbed, pulled to the ground, and arrested without warning or probable cause by NYPD officers.

k.       December 17, 2011: A journalist witnessed an NYPD officer punch his colleague, a credentialed cameraman, three times in the kidney.

l.       February 2, 2012: Several news organizations sent another letter ot the NYPD objecting to the continued mistreatment of the press by the NYPD.

m.      March 2012: A cameraman from WABC-TV was struck by an NYPD officer for unknown reasons while the photographer was reporting at a crime scene.

n.       August 12, 2012: Photographer Robert Stolarik with The New York Times, was arrested by NYPD officers and charged with obstructing government administration and resisting arrest after taking photographs of a brewing street fright in the Bronx. Mr. Stolarik was taking photographs of the arrest of a teenage girl, when a police officer told him to stop doing so. Mr. Storlarik said he identified himself as a journalist for The New York Times and continued taking photographs. A second officers appeared, grabbed Mr. Stolarik's camera and slammed it into Mr. Stolarik's face in the course of arresting him. The NYPD who alleged that Mr. Stolarik was interfering with the arrest was later convicted of lying under oath.

o.       September 15-17, 2012: Five photojournalists reporting on protests were arrested by NYPD officers at the time the photojournalists were in the course of news-gathering. One photographer was arrested after attempting to take a picture of an NYPD officer giving a dispersal order on a sidewalk. An NYPD officer forced another photojournalist to the ground and detained him, while a Lieutenant in NYPD's Legal Bureau shoved and blocked another photographer from taking a photo.

p.       September 17, 2012: Journalist Christopher Faraone was photographing a protest when NYPD officers tackled, battered, and arrested him. One of the officers allegedly directed Mr. Faraone to cease his news reporting activities within New York City.

q.       October 12, 2012: Thirteen news organizations again sent a letter to the NYPD complaining of NYPD's continued mistreatment of the press covering protests and specifically citing the arrests, detention, and mistreatment of photographers and reporters covering demonstrations.

r.      November 27, 2012: Photographer Angel Zayas was arrested while photographing NYPD officers making an arrest in Grand Central Terminal.

s.      January 16, 2013: A photographer from VIN News had his camera seized and thrown to the ground, the camera's memory card erased, and his smartphone damaged by NYPD officers because he had been photographing the officers stopping and frisking teenagers. The photographer was also handcuffed and held up against a wall by NYPD officers before he was released with a warning.

t.      April 19, 2013: A film student was arrested while filming the exterior of an NYPD precinct. The officers confiscated the photographer's cell phone, camera, and the camera's memory card.

u.      March 16, 2013: Journalist Ed Garcia Conde, who writes for the Welcome 2 Melrose blog, video recorded an interaction between an NYPD officer. The NYPD officer asked Mr. Conde to stop videotaping, and when Mr. Conde refused, the NYPD officer arrested him and issued him two summons.

v.      September 17, 2014: Photojournalist Jason B. Nicholas was on assignment for the New York Daily News to photograph the Commissioner of the National Football League. Mr. Nicholas was violently assaulted by the Commissioner's bodyguard while he was taking photographs. NYPD officers responding to the scene arrested Mr. Nicholas and charged him for assaulting the bodyguard.


176.    By March 2016, Defendant City of New York knew or should have known that members of its police force would encounter members of the media, particularly photographers with or without NYPD issued press credentials, seeking to document, via photography and other means, police incidents involving the general public. Even so, the City of New York, Commissioner of the NYPD, Mayor of the City of New York, and the Supervising Defendants failed to provide adequate training to NYPD police officers in dealing with members of the media, and particularly photographers.

177.    Proper training in following the appropriate police directives, FINEST messages, and Patrol Guides in how to deal with members of the media, particularly

photographers with or without NYPD issued press credentials, and the right of anyone to photograph police interactions with the general public would have avoided the arrest of Plaintiff Nigro.

178.    The inadequacy of training was highlighted by various letters and communications from various social justice organizations, law schools and members of the media to the NYPD, including as documented in the paragraphs above.

179.    At least from the time of Occupy Wall Street, the City of New York understood that the NYPD's treatment of members of the media, particularly photographers with or without NYPD issued press credentials, was inconsistent with its own guidelines and directives, and the need for training was obvious.

180.    The City of New York, the NYPD Commissioner, the Mayor of the City of New York and the individual supervising defendants failed to train the individual street level police officers on the proper treatment of members of the media, particularly photographers with or without NYPD issued press credentials who were documenting incidents and interactions between the NYPD and members of the public.

181.    The City of New York, the NYPD Commissioner, the Mayor of the City of New York and the individual supervising defendants failed to train the individual street level police officers on the rights of members of the media, particularly photographers with or without NYPD issued press credentials, who were documenting incidents and interactions between the NYPD and members of the public.

182.    The City of New York, the NYPD Commissioner, the Mayor of the City of New York and the individual supervising defendants showed deliberate indifference to the rights of members of the media, particularly photographers with or without NYPD

issued press credentials, who were documenting incidents and interactions between the

NYPD and members of the public by failing to properly train these police officers,

including defendant Officers LOMBARDO and ANIANO.

183.   The City of New York, the NYPD Commissioner, the Mayor of the City

of New York and the individual supervising defendants showed deliberate indifference to

the rights of members of the media, particularly photographers with or without NYPD

issued press credentials, who were documenting incidents and interactions between the

NYPD and members of the public by failing to properly supervise these police officers,

including defendant Officers LOMBARDO and ANIANO.

184.   At all relevant times herein, Defendant City of New York established

and/or followed policies, procedures, customs, and or practices, and those policies were

the cause of violation of the Plaintiff's constitutional rights granted pursuant to 42 U.S.C.

§ 1983, as well as the case of *Monell v. New York City Dep't of Social Services*, 436 U.S.

658 (1978), including those under the First, Fourth, and Fourteenth Amendments.  All of

the aforementioned acts of the Supervising Defendants, their agents, servants and

employees, were carried out under the color of state law.

185.   The City of New York, the Mayor of the City of New York, the NYPD

Police Commissioner, and the Supervising Defendants at all times leading up to the arrest

date in March 2016, had a duty to the Plaintiff and the citizens and residents of the City

of New York to make the appropriate choice among many to (1) establish, implement and

follow policies, procedures, customs, and or practices which conform to and provide for

the protections guaranteed to Plaintiff under the United States Constitution, including the

First, Fourth, and Fourteenth Amendment; (2) select, supervise, train, control, and review

the activities of all agents, servants, employees, and police officers in their employ, and (3) refrain from deliberate indifference to the Constitutional rights of the Plaintiff so as to not cause him injuries and damages alleged herein.

186.    The City of New York, the Mayor of the City of New York, the NYPD Police Commissioner, and the Supervising Defendants breached their duties and obligations to the Plaintiff by making the wrong choice when; (1) failing to establish, implement, and follow the correct Constitutional policies, procedures, customs, and/or practices; (2) failing to properly select, supervise, train, control, and review the activities of their agents, servants, employees, and police officers as to their compliance with Constitutional safeguards; (3) permitting their agents, servants, employees, and police officers to engage in the unlawful and unconstitutional conduct alleged herein; and (4) exercising, at a minimum, deliberate indifference towards the Constitutional protections afforded to the Plaintiff by disregarding the numerous communications, public reports, meetings and official complaints indicating that the policies, procedures, customs, and/or practices were improper and violated the Plaintiff and other photographers Constitutional rights.

187.    Furthermore, the members of the NYPD carried out the alleged conduct in their capacities as police officers and under the color of state law, pursuant to the policies, procedures, customs, and/or practices of the Defendant the City of New York and the NYPD, all under the supervision of the Supervising Defendants, the Mayor of the City of New York and the NYPD Police Commissioner.

188.    Defendants knew, or should have known, that by making the wrong choice that it was foreseeable it would and did cause photographers, including Plaintiff, to be

injured and damaged as a result of the constitutionally impermissible conduct undertaken pursuant to the policies, procedures, customs, and/or practices, and that such decisions occurred in contravention of public policy and their legal duties and obligations to Plaintiff and other members of the media, including photographers.

189.    The decisions, actions, and inactions, of Defendants and their agents are the legal cause of injuries to Plaintiff as alleged herein and, as a result, Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

190.    All of the foregoing acts by the individual defendants herein deprived Plaintiff of federally-protected rights.


**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 AGAINST THE DEFENDANT**
**CITY OF NEW YORK, D'ADAMO, MCNAMARA, PURTELL**
**DELIBERATE INDIFFERENCE TO THE MISCONDUCT OF**
**LOMBARDO**

191.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

192.    The City of New York, acting through the New York City Police Department and its agents, officers, and employees, has acted with deliberate indifference to the rights of the people of the City of New York to not be subjected to unconstitutional conduct by Defendant LOMBARDO.

193.    Defendants D'ADAMO, McNAMARA, and PURTELL, failed to properly discipline and supervise Defendant LOMBARDO and have therefore acted with deliberate indifference to the rights of the people of the City of New York to not be subjected to unconstitutional conduct by Defendant LOMBARDO.

194.    Despite its awareness of numerous complaints, lawsuits and negative public reports concerning the misconduct of Defendant LOMBARDO, the City, Defendants D'ADAMO, McNAMARA, and PURTELL and the NYPD have remained indifferent and failed to adequately supervise or discipline Defendant LOMBARDO to ensure that he does not violate the constitutional rights of people of the City of New York.

195.    The City and Defendants D'ADAMO, McNAMARA, and PURTELL's deliberate indifference was the moving force of the Plaintiff's injuries.

**FIFTH CLAIM FOR RELIEF**
DEPRIVATION OF FAIR TRIAL

196.    The Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

197.    Individual Defendants LOMBARDO and ANIANO created false evidence against Plaintiff Michael Nigro, creating or providing false evidence to prosecutors in the New York County District Attorney's Office.

198.    In creating false evidence against Plaintiff, and in forwarding false information to prosecutors, individual Defendants violated Plaintiff's right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

199.   Among the false statements forwarded to the prosecutors was the failure to identify the Plaintiff as working press and professional photographer.

200.   Among the false statements forwarded to the prosecutors was the statement concerning the location of the arrest of the plaintiff, as he was arrested on the sidewalk.

201.   As a consequence thereof, Plaintiff Michael Nigro has suffered harms compensable by damages, including deprivation of liberty.


### SIXTH CLAIM FOR RELIEF
PUNITIVE DAMAGES

202.   The actions of the Defendant POLICE OFFICERS constituted intentional violations of federal law.

203.   The actions of the Defendant POLICE OFFICERS were motivated by evil motive or intent, or involved involves reckless or callous indifference to the constitutionally protected rights of Plaintiff.

204.   As a result, Plaintiff is entitled to an award of punitive damages against each of the individual Defendant POLICE OFFICERS in an amount to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Empanel a jury.

[d] Award attorneys' fees and costs.

[e] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:      New York, New York
            March 15, 2019

Respectfully submitted,

Wylie Stecklow
WYLIE STECKLOW PLLC
217 Centre Street, 6th Floor
New York, New York 10013
[212] 566-8000
wylie@wylielaw.com

*Attorneys for Plaintiff*