IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

MICHAEL NIGRO,

                    PLAINTIFF,

       vs.

THE CITY OF NEW YORK, a municipal entity,
DEPUTY INSPECTOR ANDREW J. LOMBARDO,
RETIRED POLICE CHIEF THOMAS PURTELL,
POLICE CHIEF JAMES McNAMARA, POLICE
INSPECTOR JOHN D'ADAMO, OFFICER JOSEPH
ANIANO,

                  DEFENDANTS.

_____

INDEX NO. 19-cv-2369-JMF
ECF CASE

SECOND
AMENDED COMPLAINT

JURY TRIAL DEMANDED

Plaintiff MICHAEL NIGRO, by his attorneys, WYLIE STECKLOW PLLC and RICHMAN LAW GROUP, complaining of the Defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.     Plaintiff brings this action for compensatory damages, punitive damages, equitable relief, and attorneys' fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights.

2.     Plaintiff Michael Nigro is a fifty-two-year-old award-winning filmmaker, a six-time Emmy-nominated writer-director, and a multi-media journalist, whose articles and photographs have appeared in *Rolling Stone*, *Time*, *The Guardian*, and National Public Radio, among several other media outlets. Formerly a multimedia journalist with Buzzfeed News, he is currently represented by SIPA USA, the international media agency, and regularly contributes to the publications *TruthDig* and *Huffington Post*.

1

3.      On March 19, 2016, Mr. Nigro was photographing a news event, when he was falsely arrested by New York City Police Department ("NYPD"). The photographs he was able to take before his arrest at this newsworthy event were uploaded and available for license and distribution for publication in newspapers and other media by Getty Images, Inc. and Pacific Press Agency, international photo news agencies, with one image licensed to a German publication and published internationally.



4.      That day, Mr. Nigro decided to cover what he understood would be a large-scale protest against then-presidential candidate Donald Trump.

5.      Approximately 2,000 protesters participated in the demonstration, which was reported on by Mr. Nigro, as well as by CBS, *The New York Post*, Fox News, and other media outlets.

6.      Approximately two hours after the demonstration had begun, Defendant POLICE DEPUTY INSPECTOR ANDREW J. LOMBARDO grabbed Mr. Nigro from where he stood on the sidewalk, camera in hand, reporting on the protest. Defendant LOMBARDO then pulled Mr. Nigro into the street, and with Defendant POLICE OFFICER JOSEPH ANIANO and other defendant police officers from the New York Police Department's Strategic Response Group, arrested Plaintiff, detained him for several hours, and charged him with disorderly conduct.

7.      As a result of this false arrest, Mr. Nigro was detained in police custody for the remainder of the protest and thereby prevented from reporting on this newsworthy event.

8.      Mr. Nigro was further compelled to appear at court to face the false charge of disorderly conduct, which was ultimately dismissed.

9.      Despite receiving numerous complaints prior to March 2016 concerning the NYPD's treatment of media,[1] including photographers with and without media credentials, the City of New York chose not to properly train officers on the First Amendment rights of media, including photographers, during incidents involving interactions between the NYPD and the general public.

10.      This false arrest would not have occurred but for the deliberate decision made by the City of New York not to properly train NYPD officers on the First Amendment rights of media,

---

[1] Complaints have been filed by numerous social justice groups, media entities, and legal scholars, including the New York Civil Liberties Union, the *New York Times,* the *New York Post,* the *Daily News, Thomas Reuters, Associated Press,* WABC-TV, NBC Universal, WCBS, Dow Jones & Company, New York Press Photographers Association, National Press Photographers Association, professors and students at The Global Justice Clinic at NYU Law School, The Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School, The International Human Rights Clinic at Harvard Law School, The International Human Rights and Conflict Resolution Clinic at Stanford Law School, The Civil Rights Clinic at the Charlotte School of Law, The Community Justice section of Loyola Law Clinic-New Orleans, and The Constitutional Litigation Clinic at Rutgers School of Law-Newark.

including photographers, during incidents involving interactions between the NYPD and the general public.

11.     On or around the date of Plaintiff Nigro's arrest, Defendant LOMBARDO was a supervising Executive Officer of the NYPD's Strategic Response Group ("SRG"), which was created in 2015 to be a specialized unit tasked with immediate intervention duties during periods of civil unrest, terrorist incidents, or other citywide emergencies (*i.e.*, to police mass protest and terrorism).

12.     In or before the summer of 2019, Defendant LOMBARDO was transferred out of the SRG and no longer assigned to street policing of protest activity.

13.     On or around the date of Plaintiff Nigro's arrest, Defendant JOHN D'ADAMO was the Commanding Officer ("CO") of the SRG, and a supervisor of Defendant LOMBARDO.

14.     On or around the date of Plaintiff Nigro's arrest, Defendant JAMES McNAMARA was the second highest ranking executive officer of the NYPD's Citywide Special Operations Bureau, which oversees multiple specialized police units including SRG, Emergency Service Unit, Aviation Unit, Harbor Unit, Mounted Unit. Defendant McNAMARA was a direct supervisor of the SRG, its supervising officer Defendant LOMBARDO, and its Commanding Officer Defendant D'ADAMO.

15.     On the date of Plaintiff Nigro's arrest, the Chief of the NYPD's Special Operations Bureau was Defendant Chief Thomas PURTELL, who was also a supervisor of Defendants McNAMARA, LOBARDO, and D'ADAMO.

16.     Defendant PURTELL was forced into early retirement in January 2018 by current commissioner Thomas O'Neil because PURTELL'S "philosophy was not consistent" with that of the commissioner, including PURTELL'S vision on community policing.[2]

17.     Defendants D'ADAMO, McNAMARA, PURTELL, and the CITY OF NEW YORK failed to properly discipline and supervise Defendant LOMBARDO, until sometime after the date of Plaintiff's arrest, when Defendant LOMBARDO was eventually transferred out of the SRG and no longer assigned to street policing of protest activity.

18.     These Defendants failed to supervise Defendant LOMBARDO despite being aware of documentation, including video, of misconduct by Defendant LOMBARDO directed at members of the general public, specifically including those engaged in First Amendment-protected activity.

19.     Had Defendant LOMBARDO been removed from the SRG and street policing of protest activity prior to the date of arrest, the false arrest would not have occurred.

20.     Defendant LOMBARDO's lack of training in proper policing of media, specifically photographers, engaged in news gathering was a cause of the unconstitutional arrest of Plaintiff Nigro.

21.     On March 19, 2016, Mr. Nigro was at all times lawfully exercising his First Amendment-protected right to gather news on a topic of widespread public interest. Nonetheless, the Defendant POLICE OFFICERS that arrested Mr. Nigro, including Defendant ANIANO and Defendant LOMBARDO, under the direction of Defendant CITY OF NEW YORK, the New York

---

[2] *See* Rocco Parascandola et al., *NYPD top cop promotes 12 officers, transfers others in big administrative shakeup*, NY Daily News (Jan. 8, 2018), https://www.nydailynews.com/new-york/nypd-top-shakes-police-brass-promotions-transfers-article-1.3745396.

City Police Department, Strategic Response Group Commanding Officer Inspector D'ADAMO, and Commissioner William Bratton, prevented Mr. Nigro from reporting on the protest by falsely arresting him, detaining him, and charging him with an offense that he never committed.

22.     Defendants violated Mr. Nigro's constitutional rights and caused harm to Plaintiff, which continues to today, as a direct result of those constitutional violations.

## II. JURISDICTION

23.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First and Fourth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4).

## III. VENUE

24.     Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) because the claims arose in this district.

## IV. JURY DEMAND

25.     Plaintiff MICHAEL NIGRO respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

26.     Plaintiff MICHAEL NIGRO (the "Plaintiff") is a resident of the State of New York and the County of Kings.

27.     Defendant THE CITY OF NEW YORK ("Defendant CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

28.    Defendant CITY maintains the New York City Police Department ("NYPD"), which acts under the direction and supervision of the aforementioned municipal corporation, Defendant CITY.

29.    At all times relevant herein, Defendant POLICE DEPUTY INSPECTOR ANDREW J. LOMBARDO was a duly sworn police deputy inspector of the NYPD and was acting under the supervision of said department and according to his official duties. On information and belief, at all relevant times, Defendant LOMBARDO was assigned in a supervising capacity within Defendant NYPD's Strategic Response Group. Plaintiff sues Defendant LOMBARDO in both his official and individual capacities.

30.    At all times relevant herein, Defendant POLICE OFFICER JOSEPH ANIANO (Tax Identification No. 948620; Badge No. 106) was a duly sworn police officer of the New York City Police Department assigned to the B-1 Squad of the Strategic Response Group 3 and was acting under the supervision of said department and according to his official duties.

31.    At all times relevant herein, Defendant POLICE INSPECTOR JOHN D'ADAMO was a duly sworn police inspector of the NYPD and was the commanding officer and a supervisor of Defendant LOMBARDO, acting under the supervision of said department and according to his official duties. On information and belief, at all relevant times, Defendant D'ADAMO was assigned in a command capacity over Defendant NYPD's Strategic Response Group. Plaintiff sues Defendant D'ADAMO in both his official and individual capacities.

32.    At all times relevant herein, Defendant POLICE CHIEF JAMES McNAMARA was a duly sworn police deputy inspector of the NYPD and was acting under the supervision of said department and according to his official duties. On information and belief, Defendant McNAMARA is assigned in a command capacity in the CITYWIDE OPERATIONS BUREAU

that oversaw the Defendant NYPD's Strategic Response Group. Plaintiff sues Defendant McNAMARA in both his official and individual capacities.

33.    At all times relevant herein, Defendant RETIRED POLICE CHIEF THOMAS PURTELL was a duly sworn police Chief of the NYPD and was acting under the supervision of said department and according to his official duties. On information and belief, Defendant PURTELL was assigned in a command capacity in the CITYWIDE OPERATIONS BUREAU that oversaw the Defendant NYPD's Strategic Response Group. Plaintiff sues Defendant PURTELL in both his official and individual capacities. Defendants PURTELL, D'ADAMO and McNAMARA are collectively referred to as the Supervising Defendants herein.

34.    At all times relevant to this action, the Defendant POLICE OFFICERS, including ANIANO, LOMBARDO, D'ADAMO, McNAMARA and PURTELL, either personally or through their employees, were acting under color of state law and/or pursuant to the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

35.    Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK.

## VI. FACTS

### Facts Common to All Claims

36.    Plaintiff Michael Nigro is a media professional whose notable career as a writer, director, photographer, and print journalist spans over two decades.

37.    Mr. Nigro, formerly a multimedia journalist with *Buzzfeed News*, is currently represented by SIPA USA, an international media agency, and is directing his own documentary film.

38.     Plaintiff's previous feature documentary films have been selected for film festivals and released theatrically.

39.     Over the years, Mr. Nigro has also been nominated for six Emmy awards, three for writing and three for directing, for his television work.

40.     In 2015, Mr. Nigro was awarded the Art & Activism Prize by the Theo Westtenberger Estates for his coverage as a photographer and writer, of protests in the United States regarding climate change, police brutality, and other social justice issues.

41.     In 2016, Mr. Nigro was shortlisted for the D&AD International Next Photographer award for his photojournalism series "Escape From Freedom" on anti-police brutality protests in New York City.

42.     One of Mr. Nigro's photographs from the "Escape from Freedom" series, which is featured on the D&AD website (https://www.dandad.org/awards/next-awards/2016/next-photographer/67/escape-from-freedom/) and reproduced below, captures Defendant LOMBARDO at a large protest on April 29, 2015, pointing aggressively at a Black man standing before him with his baton raised overhead. This photo was taken and promoted approximately 11 months before Defendant LOMBARDO's arrest of Plaintiff Nigro.



43.     Upon information and belief, Defendant LOMBARDO was (i) aware of the above photograph being published on the internet, (ii) that the photographer of the image was Michael Nigro, and (iii) on the date of arrest Defendant LOMBARDO recognized Plaintiff as the photographer who published this image. Mr. Nigro was told by a number of individuals that since publishing this photograph he was a target of Defendant LOMBARDO and/or was in the LOMBARDO zone, in reference to the video found: https://wearechange.org/13200/.

44.     Since 2011, Mr. Nigro has regularly reported on protests in addition to his filmmaking. His photographs and writing on such events have appeared in *Vice*, *The Guardian*, *The Intercept*, National Public Radio, *Rolling Stone*, *Time*, *Huffington Post*, and several other media outlets.  He is now signed with Reuters as a photojournalist and has covered numerous press issues including the Charlottesville protest, where he was one of the first people to be impacted by the vehicle that killed Heather Heyer (see a photo taken by Plaintiff below).



45.     During the 2016 Presidential election, Plaintiff traveled to over a dozen states, and recently spent nearly a month in Tijuana covering issues at the U.S.-Mexico border. A photograph taken by Plaintiff during this time is featured below.



46.     On March 19, 2016, Mr. Nigro, along with a multitude of other journalists, reported on a mass protest in New York City against then-Republican candidate Donald Trump.

47.     However, Mr. Nigro's reporting on the protest was cut short by Defendants LOMBARDO and ANIANO, who without legitimate cause, arrested Mr. Nigro.

48.     The protest began at 12 pm with a rally at Columbus Circle and ended, after a march through midtown Manhattan, at approximately 4 pm with a closing rally back at Columbus Circle.

49.     As is visible in Mr. Nigro's photographs from the protest, reproduced below, NYPD assigned a significant number of officers to police the protest, including members of the SRG.

50.     Just after the march began, Mr. Nigro took the photograph below at the intersection of 59th Street and 6th Avenue, at the edge of Central Park. Mr. Nigro licensed this photograph,

and others he took at the protest, to Getty Images, which licenses Mr. Nigro's photographs to media and other customers. The time stamp on this image is: 13:31:04 (1:04pm).



51.    Mr. Nigro took the next striking image on 57th Street between 5th and Madison Avenues. Several other photojournalists are seen in the street, while the bulk of the protesters are marching on the sidewalk. This image was published internationally, see paragraph 3. The time stamp on this image is:  13:46:50 (1:46pm).



52.    Defendant D'ADAMO is visible in the photograph above in the front row with his right arm bent at the elbow and left hand in his pocket at the front of the group of officers. Defendant LOMBARDO is visible in the photograph above, just beyond the head of Defendant D'ADAMO, in the third row of NYPD officers, walking along the white dotted line on the south

side of 57th Street wearing the baseball hat that has an image but not the letters NYPD. On information and belief, Defendant McNAMARA may also be visible in this photograph in the back-left hand side of the image just above and to the left of Defendant LOMBARDO's head. A member of DCPI is visible in this image as are members of the NYPD legal bureau.

53.      Mr. Nigro took the next photograph moments later, just as Defendant LOMBARDO, an SRG Captain, and a third SRG officer, arrested a photographer. (The caption to the left of the image on the Getty Images' page incorrectly identifies the arrestee as a protester.) The time stamp on this image is: 13:47:07 (1:47pm).



54.      On information and belief, this was the first arrest at the protest.

55.      After taking photographs of this arrest, Mr. Nigro moved with the march as it turned south on Madison Avenue between 57th and 56th Streets.

56.      At this time, Mr. Nigro walked south on the west side of Madison Avenue on the sidewalk.

57.     At approximately 1:47, Defendant LOMBARDO, in the street, identifies Mr.

Nigro who is on the sidewalk. This image is time stamped: 13:47:26 (1:47pm).



58.     After looking directly at Mr. Nigro, Defendant LOMBARDO speaks into his radio.

This image is time stamped: 13:47:46 (1:47pm). A photographer is standing in the street between

Mr. Nigro (on the sidewalk) and Defendant LOMBARDO in the street.



59.     Approximately 1 minute later,   Defendant LOMBARDO,   ignoring the photographer standing nearby in the street, entered the sidewalk, ran through a crowd of people directly towards Mr. Nigro, grabbed him by the neck, and with the assistance of Defendant ANIANO, forced Mr. Nigro from the sidewalk into the crosswalk on the north side of 56th Street at Madison Avenue.

60.     A photograph of the initial moments of Mr. Nigro's arrest is reproduced below. (The photographer of this image is unknown.)



61.     Immediately before this arrest, Defendant LOMBARDO had the opportunity to observe Mr. Nigro reporting on the protest as a photojournalist, since Defendant LOMBARDO was photographed by Plaintiff on 57th Street minutes before he arrested Plaintiff. *See* paragraphs 57 & 58 and related images.

62.     Mr. Nigro was also easily identifiable as a professional photographer covering the protest. He was carrying a professional-style single-reflex lens camera with a large lens and was, as Defendant LOMBARDO had the opportunity to observe, photographing the event.

63.     In a video posted online,[3] it seems that a member of the NYPD Legal (in the POLICE windbreaker visible in the video and in the photo paragraph 3) is informed by a bystander that Mr. Nigro is press. The NYPD Legal turns to ask or express this to Defendant LOMBARDO.

---

[3] YouTube.com (Mar. 19, 2016), https://www.youtube.com/watch?v=CAZAMCqv42w.

In response, Defendant LOBMARDO winks at the NYPD Legal member and then instructs certain officers to push people back onto the sidewalk.

64.     Also visible among the NYPD surrounding Mr. Nigro's arrest is an unidentified Executive Officer who seems to have one gold star, indicating a rank of Deputy Chief, and a member of TARU with a video camera in his hand.



65.     Although Mr. Nigro did not have a DCPI NYPD issued Press Pass on the date of his arrest, he was working that day as a professional photographer, and in light of his continued work as a professional photographer, he has since been issued an NYPD Press Pass (see image below).



66.     Mr. Nigro's arrest for allegedly being in the street is clearly selective enforcement. On that date, there were numerous individuals in the street, including non-protesters. None of these individuals were arrested. Mr. Nigro, a working photographer and member of the press engaged in First Amendment-protected activity was arrested and charged with blocking vehicular traffic. Below is a screen capture from an online video of the protest, showing non-participating civilians in the street.[4]



---

[4] YouTube.com (Mar. 16, 2016), https://www.youtube.com/watch?v=9-7IaFOvDm4.

67.     As evidenced by the Image associated with paragraph 42 above, Defendant LOMBARDO had also encountered Plaintiff acting as photojournalist at a previous protest, when Plaintiff had previously photographed Defendant LOMBARDO at close range.

68.     Upon information and belief, Defendant LOMBARDO has previously identified individuals that he has interacted with while policing First Amendment activity and learned private information about these individuals that would only be available if Defendant LOMBARDO undertook some type of fact-finding search.

69.     A *Gothamist* article on Defendant LOMBARDO, which identifies him as the "NYPD's Most Notorious Anti-Activist Cop," reported on this behavior: "'[Captain Lombardo] used my legal name. That's how he would mess with me,' long-time Occupy Wall Street protestor Yonatan Miller told us. 'Everyone called me "Yoni," the only way anyone would know my legal name is if they had been running information on me. When he approached me he said my complete name, I took this to mean he wanted me to know that I was being watched. I am a Dutch citizen, this compelled me to stop protesting—I didn't want any immigration problems.'"[5]

70.     On information and belief, Defendant LOMBARDO singled out Mr. Nigro for arrest because he was documenting this newsworthy event.

71.     On information and belief, Defendant LOMBARDO chose to arrest Mr. Nigro precisely because he was a photographer.

---

[5] Adam Johnson & Keegan Stephan, *From Abu Ghraib to Black Lives Matter: Meet the NYPD's Most Notorious Anti-Activist Cop*, Gothamist (Sept. 23, 2015), https://gothamist.com/news/from-abu-ghraib-to-black-lives-matter-meet-the-nypds-most-notorious-anti-activist-cop.

72.     On information and belief, Defendant LOMBARDO chose to disregard that Mr. Nigro was visibly engaging in legitimate and constitutionally-protected news-gathering immediately before arresting him.

73.     On information and belief, Defendant LOMBARDO chose to arrest Mr. Nigro in retaliation for his prior photography of Defendant LOMBARDO including the images at paragraphs 42, 50, and 53.

74.     Notably, in the minutes before Defendant LOMBARDO arrested Mr. Nigro, he had arrested another photographer (see image in paragraph 53), but also ignored another photographer in the roadway in order to focus on Mr. Nigro (see image in paragraph 58).

75.     Onlookers to Mr. Nigro's arrest shouted, "He is a journalist!" to Defendant Officers as they apprehended Plaintiff.

76.     Defendant LOMBARDO and the other defendants herein had no lawful reason to arrest Plaintiff.

77.     A photograph of Defendant ANIANO placing Plaintiff into handcuffs is reproduced

below. (This photograph is attributed to AP Photo/Mary Altaffer.)



78.     On information and belief, while arresting Plaintiff, Defendant LOMBARDO and

Defendant ANIANO forced Mr. Nigro from the sidewalk into the street in an attempt to justify

charging Mr. Nigro with disorderly conduct.

79.     Additionally, during the initial moments of the arrest, the NYPD officers pushed

Mr. Nigro into a yellow taxi, that was moving.  This was dangerous and there was no reason to put

Mr. Nigro in harm's way.

80.     At no relevant time did Mr. Nigro engage in any conduct that would rise to probable

cause for his arrest and/or justify his being charged with disorderly conduct.

81.     At all times, Mr. Nigro was engaged in photographic journalism protected by the

First Amendment, and at no time did Mr. Nigro block any vehicular traffic.

82.     NYPD transported Mr. Nigro to One Police Plaza following his arrest.

83.    Plaintiff was held in NYPD custody for approximately 6 hours before he was released with a Desk Appearance Ticket for Disorderly Conduct, even though he had not committed that offense.

84.    By the time he was released at approximately 6:30 pm from a location more than 5 miles from the protest site, Plaintiff was unable to continue reporting on the protest, which had ended at approximately 4:00 pm at Columbus Circle.

85.    As a result of the false arrest, Mr. Nigro was unable to report on over two-and-a-half hours of the newsworthy protest.

86.    This arrest was effectuated by members of the NYPD's SRG.

87.    Defendant D'ADAMO was the commanding officer of the SRG at the time of this arrest, and was responsible for supervising all officers, and upon information and belief was present at the protest during the plaintiff's arrest.

88.    Upon information and belief, all Defendants but Chief PURTELL were present during the protest that day, and many additional Executive Officers (rank of Captain or above and ordinarily wear white collared shirts) were present during this protest. The following photos show various identified and unidentified Executive Officers present at the protest.





 

 

89.     At a protest like the one at which Mr. Nigro was arrested, Mr. Nigro can snap up to 1,000-1,500 photographs. The key is for Mr. Nigro to file them to an intake news desk quickly so that news outlets can purchase them. An arrest removed Mr. Nigro from hours of work, and he was delayed in uploading some of the images that he did take prior to being arrest, which affected their commercial value.

90.     On or about May 2, 2016, Mr. Nigro appeared at court to answer the false charge made against him.

91.     At this appearance, Mr. Nigro accepted an offer of adjournment in contemplation of dismissal for the charge, which was dismissed on or about November 1, 2016.

92.     Plaintiff is professionally known for and possesses unique skills and artistry for reporting on protests.

93.     As a result of the above unlawful conduct, Plaintiff was caused to suffer violation of his civil rights, loss of liberty, and other special damages.

**Facts Relating to Failure to Train & Failure to Supervise**

94.     As early as 1977, the City publicly acknowledged that individuals are free to photograph police activity so long as the photography does not "directly endanger" an officer or another person.  This language was part of a City of New York, "so-ordered" consent decree in *Black v. Codd*, 73 Civ. 5283 (JMC) (S.D.N.Y.). The terms of that consent decree were incorporated into the NYPD's Patrol Guide.

95.     The consent decree of *Black v. Codd* states that:

> 2.  None of the following constitute probable cause for arrest or detention of an onlooker unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated:
>
>> (c) Taking photographs

96.     In March 2005, the City entered into a settlement, in *Ya-Ya Network v. City of New York*, 03-CV-8351-DLC (S.D.N.Y.), acknowledging that public sidewalks near schools are appropriate locations for the full range of First Amendment activity.

97.     The NYPD arrested numerous journalists during the Occupy Wall Street ("OWS") demonstrations in 2011 and 2012. In a single instance, the NYPD arrested at least ten people for attempting to take video or photographs when the NYPD cleared Zuccotti Park of protestors.

98.     In 2011, the NYPD issued a "Finest Message" concerning the rights of journalists to cover police interactions and incidents without arrest; however, these messages did not involve any update to the training that members of the NYPD or the Strategic Response Group receive concerning the rights of media at police incidents.

99.     A Finest Message is a written department-wide communication that, per standard operating procedures, is required to be read at ten consecutive roll calls.[6]

100.     The NYPD has a unit that is in charge of media relations, including the issuance of press credentials, the Public Information Division ("DCPI").

101.     In 2011, Detective Gin Sarubbi in the office of the DCPI stated that "We aren't issuing press credentials to reporters covering Occupy Wall Street."

102.     In 2011, the Commanding Officer of DCPI was Assistant Chief Kim Royster.

103.     In the lawsuit of *Poo Soto v. City of New York, et al,* 13-CV-8474 (LTS) (S.D.N.Y.), the City of New York was deposed (NYPD Asst. Chief Royster testified as a Rule 30(b)(6) witness on behalf of the City of New York) on September 28, 2015, in a transcript available publicly on the docket as entry 84-10.

104.     Defendant CITY OF NEW YORK testified that DCPI was aware of numerous complaints made to the NYPD regarding the NYPD's treatment of journalists covering Occupy Wall Street events.

105.     Defendant CITY OF NEW YORK testified that "there wasn't any data compiled" regarding the number of complaints made about NYPD treatment of the press who were covering Occupy Wall Street.

106.     In a lawsuit involving photographer J.B. Nicholas (see paragraphs 163-168), an attorney for the CITY OF NEW YORK stated to federal Judge J. Paul Oetken that there is no written standard for summarily revoking a journalist's credentials.

---

[6] *See Brown v. Kelly*, No. 05 Civ. 5442, 2007 US Dist. LEXIS 39527, at *8 n.17 (S.D.N.Y. May 31, 2007) (quoting affidavit of Steven M. Anger, currently an NYPD Chief).

107.    DCPI conducts a 90-minute training on media relations for members of service. Provision of this training began in 2010. Each training session includes from 20 to 200 officers.

108.    DCPI does not keep a record of which officers are trained.

109.    Prior to November 23, 2011, DCPI provided training in media relations to no more than 900 officers.

110.    In 2012, DCPI provided training in media relations to between one and two thousand officers.

111.    At that time, there were approximately 35,000 uniformed members of the NYPD.

112.    Defendant CITY OF NEW YORK has testified that the only written materials used to ensure that members of service complied with NYPD policy to protect freedom of the press were "patrol guide procedures that deal with breaking news events, media relations, how to deal with the media at an event and instructions on what is censorship and how to protect the First Amendment."

113.    Defendant CITY OF NEW YORK testified that it is unaware of any specific officer who has been investigated for failure to follow NYPD policy regarding media relations and to protect First Amendment rights.

114.    Defendant CITY OF NEW YORK testified that it is aware of only one officer who was disciplined for failing to follow those policies, and that the discipline consisted of retraining.

115.    Defendant CITY OF NEW YORK testified that members of the press who are not issued press credentials by the NYPD are simply members of the public.

116.    Defendant CITY OF NEW YORK testified that DCPI media relations training applies only to members of the press who are issued press credentials by the NYPD.

117.    Defendant CITY OF NEW YORK testified that if a journalist does not carry a credential issued by the NYPD, DCPI cannot validate whether that person is actually a member of the media.

118.    Defendant CITY OF NEW YORK testified that if a journalist who has been issued a press credential issued by the NYPD is arrested, a report is automatically made to the DCPI for the purpose of revoking the press credential.

119.    The improper policing of media, including photographers, at newsworthy events has been documented since at least the Republican National Convention of 2004 and during Occupy Wall Street in 2011 and 2012, and thereafter, up to and including, the date of Mr. Nigro's arrest that is the subject of this complaint.

120.    Numerous instances across the past several years illustrate both the NYPD's knowledge of this improper conduct towards journalists and the NYPD's failure to take substantive steps to remedy the issue.

121.    In one well-publicized instance, in the early hours of November 15, 2011, the NYPD sought to clear Zuccotti Park and held all media in a cordoned off area a distance away from the park.

122.    On November 21, 2011, the New York Civil Liberties Union ("NYCLU") sent a letter[7] to NYPD Commissioner Raymond Kelly and Mayor Michael Bloomberg about the NYPD conduct towards media on November 15, 2011. In this letter, the NYCLU stated in part, "as you undoubtedly are aware, there have been many public accounts of reporters, photographers, and other journalists being mistreated and subjected to physical force during OWS protests and further of over 25 journalists being arrested."

---

[7] See NYCLU Letter dated 11/21/11, attached hereto as Exhibit A.

123.    On information and belief, the NYPD took no meaningful action to address the concerns raised by the NYCLU's letter.

124.    Also on November 21, 2011, the *New York Times*, the *New York Post*, the *Daily News*, *Thomas Reuters*, *Associated Press*, WABC-TV, NBC Universal, WCBS, Dow Jones & Company, New York Press Photographers Association, National Press Photographers Association submitted a letter ("Media Letter")[8] to the NYPD that set out examples of police behavior that violated NYPD policy and procedures concerning media on or about November 15, 2011, during police interaction with the public while clearing Zuccotti Park.

125.    This Media Letter included an example of a credentialed photographer being threatened with arrest for being inside Zuccotti Park.

126.    This Media Letter included an example of a credentialed press photographer who was given inconsistent instructions by the NYPD about where to stand and was eventually thrown to the ground by an NYPD officer with sufficient force for the photographer's head to hit the pavement.

127.    Another example included in the Media Letter described a group of photographers being forcibly pushed back by an NYPD officer, causing a reporter to fall backwards onto her elbow and cry out in pain. The officer lifted this journalist up by the collar and screamed at her to "stop pretending." The reporter was taken to Bellevue Hospital for treatment of her injuries.

128.    The Media Letter further described an incident involving a photographer seeking to take a photograph of a bloodied individual being removed by the NYPD from Zuccotti Park. At the time that the photographer raised his camera to take the photo, two officers of the NYPD lunged

---

[8] On February 1, 2012, the same signatories followed up with the NYPD on their communications and meetings concerning issues involving policing press relations. *See* Media Letter dated 11/21/11 and Follow-Up Media Letter dated 2/1/12, attached as Exhibit B hereto.

at the photographer with a metal barrier, striking the photographer in the chest, knees, and shin. As described in the Media Letter, the officers shouted that the photographer was "not permitted to take photographs on the sidewalk," despite it being "the most traditionally recognized public forum aside from a park."

129.    The Media Letter also identified a meeting in August 2011[9] between the NYPD and members of the media, wherein it had been "agreed that additional training to reinforce media guidelines" was needed and appropriate for members of the NYPD.

130.    On information and belief, a similar meeting was held between these members of the media and high-ranking members of the NYPD on or about November 23, 2011.

131.    After this November 23, 2011 meeting, the NYPD Commissioner issued a FINEST message "to remind members of the service of their obligations to cooperate with media representatives acting in a news-gathering capacity at the scene of police incidents."

132.    Upon information and belief, the NYPD took no further substantive action in response to the incidents described in the Media Letter.

133.    Following the Occupy Wall Street incidents, on December 6, 2011, United States Congressman Jerrold Nadler wrote a letter to the United States Attorney General requesting that the Department of Justice initiate an investigation into law enforcement activities surrounding demonstrations.[10] This well-publicized letter explicitly described the "actions of the NYPD to

---

[9] An October 17, 2011 letter from the National Press Photographers Association preceded this letter and also documented the August 2011 meeting, highlighting an admission in the meeting by the NYPD Deputy Commissioner of Public Information that additional training to reinforce media guidelines would be beneficial. This letter was signed by media organizations, including NPPA, WCBS-TV, *The NY Times, The Daily News, The Associated Press, Thomas Reuters*, NBC Universal WNBC-TV, Dow Jones & Company. *See* NPPA letter dated 10/17/11, attached hereto as Exhibit C.

[10] *See* Congressman Nadler letter dated 12/6/11, attached hereto as Exhibit D.

prevent the press from covering" Occupy Wall Street as "affect[ing] core First Amendment values, not just of the right of the press to report, but also the public's right to be informed on matters of great civic importance."

134.    Upon information and belief, the NYPD took no substantive action in response to the issues raised in Congressman Nadler's letter.

135.    The NYPD's conduct of limiting the access of members of the media, including photographers, from the sight and sound of interactions between the NYPD and the public, especially at expressive speech activity and First Amendment protected activity, has persisted since Occupy Wall Street.

136.    During Occupy Wall Street, numerous photographers were arrested covering protest activity.[11]

137.    Among the photographers arrested were Stephanie Keith on October 1, 2011 and September 15, 2012; Justin Bishop on November 15, 2011; Jared Maslin on November 15, 2011; Charles Meacham on December 12, 2011 and September 15, 2012; Julia Reinhart on September 17, 2012; and Timothy Eastman on September 17, 2012.

138.    These incidents are particularly illustrative of the pattern of improper conduct by the NYPD. For example, Ms. Keith's September 15, 2012 arrest was carried out by NYPD Lieutenant Daniel Albano, who approached her while she was photographing a protest and proceeded to grab and shove her. Lieutenant Albano is, to this day, a member of NYPD's legal bureau and thus responsible for providing legal guidance to the Department as a whole.

---

[11] *See* Appendix III to the Suppressing Protest Report (identifying the photographers and other media individuals arrested in New York during Occupy Wall Street), attached hereto as Exhibit E.

139.    In response to the NYPD's conduct during the Occupy Wall Street protests, international human rights and U.S. civil liberties experts from law schools across the United States banded together and created the *Protest and Assembly Project*, which released the comprehensive and damning report entitled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* on July 21, 2012.[12]

140.    The Suppressing Protest Report documented numerous violations of the NYPD against photographers, such as violence against a credentialed photographer on December 31-January 1 (page 74); arrests of photographers (page 85-86); 44 arrests by the NYPD of journalists during Occupy Wall Street (page 87 and footnote 115); physical abuse of journalists by the NYPD (page 88); other obstructions of press freedoms (page 89); pepper spray of FOX 5 photographer Roy Isen on October 5, 2011 (Appendix #22); and other improper conduct towards photographers (Appendix I ##40, 56, 61, 66, 79, 80, 81, 92, 99, 103).

141.    Upon information and belief, the NYPD took no substantive action in response to incidents described in the Suppressing Protest Report.

142.    In August 2012, the general counsel for the National Press Photographers Association ("NPPA") wrote to the NYPD concerning improper treatment of photo journalist Robert Stolarik.[13] The letter documented various dates and incidents wherein members of the NYPD violated the NYPD Patrol Guide directives and the previous Finest Message in mistreatment of photographers.

---

[12] The Global Justice Clinic (NYU School of Law), Walter Lestner Int'l Human Rights Clinic (Fordham Law School), *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (July 21, 2012), https://chrgj.org/wp-content/uploads/2016/09/suppressingprotest.pdf (the "Suppressing Protest Report").

[13] *See* NPPA letter dated 8/6/12 and follow-up letter dated 10/1/12, attached hereto as Exhibit F.

143.   As described in the NPPA letter, on August 4, 2012, an NYPD officer falsely arrested *New York Times* photographer Robert Stolarik, who was photographing an arrest in the Bronx as part of a story on the NYPD's "stop and frisk" policy.

144.   When Mr. Stolarik attempted to photograph the arrest, he was confronted aggressively by NYPD officers. The arresting officer claimed that Mr. Stolarik repeatedly discharged a camera flash in his face.

145.   Mr. Stolarik was charged with obstructing government administration and resisting arrest.

146.   Mr. Stolarik's camera was later shown not to have a flash. All charges against him were dropped. The officer who arrested Mr. Stolarik was convicted of a felony for offering a false instrument for filing.

147.   The August 2012 NPPA letter also recounted incidents of NYPD interference with press photographers at the scene of a fire in Brooklyn on November 24, 2011, at the Macy's Thanksgiving Day Parade in Manhattan, and in December 2011 at an Occupy Wall Street protest.

148.   The NPPA had also made the NYPD aware of such incidents prior to this letter; between December 2011 and August 2012, the NPPA sent to DCPI Deputy Commissioner Robert Brown information regarding several incidents of NYPD interference with photojournalists.

149.   Deputy Commissioner Brown did not respond to these communications.

150.   Upon information and belief, the NYPD took no substantive action in response to the incidents described in these communications or in the August 2012 or the October 2012 follow-up letter.

151.   In response to numerous complaints by members of the press and the public, and various civil rights organizations, concerning the routine violations of the First Amendment and

the consent decree in *Black v. Codd*, the NYPD's Chief of Department – in, on information and belief, the summer of 2014 – issued a "FINEST MESSAGE  General Administrative Information" which reiterated the written policy (the consistent violation of which has been long-tolerated within the NYPD) of the NYPD to be as follows:

TO:  ALL COMMANDS

RE: RECORDING OF POLICE ACTION BY THE PUBLIC

MEMBERS OF THE SERVICE ARE REMINDED THAT MEMBERS OF THE PUBLIC ARE LEGALLY ALLOWED TO RECORD (BY VIDEO, AUDIO, OR PHOTOGRAPHY) POLICE INTERACTIONS.  THESE INTERACTIONS INCLUDE ARREST AND OTHER SITUATIONS. MEMBERS OF THE SERVICE WILL NOT INTERFERE WITH A PERSON'S USE OF RECORDING DEVICES TO RECORD POLICE INTERACTIONS. INTENTIONAL INTERFERENCE SUCH AS BLOCKING OR OBSTRUCTING CAMERAS OR ORDERING THE PERSON TO CEASE CONSTITUTES CENSORSHIP AND ALSO VIOLATES THE FIRST AMENDMENT.

IT SHOULD BE NOTED, HOWEVER, THAT PERSONS MAY NOT INTERFERE WITH POLICE OPERATIONS. MEMBERS, IF APPROPRIATE, SHOULD ADVISE THE PUBLIC NOT TO GET TOO CLOSE AND MAY TAKE ACTION ONLY IF THE PERSON INTERFERES WITH THE OPERATION OR THE SAFETY OF THE MEMBERS OF THE SERVICE OR THE PUBLIC.  HOWEVER, MERE RECORDING OF AN INCIDENT DOES NOT CONSTITUTE INTERFERENCE.  COMMANDING OFFICERS WILL ENSURE THAT THE CONTENTS OF THIS MESSAGE ARE DISSEMINATED TO ALL MEMBERS OF THE SERVICE.

152.    In fact, the NYPD has,  since at least the 1970's, stated an intent to train its officers that citizens and members of the public have a right to film and record police activity. *See, e.g.*, *Gerskovich v. Iocco*, No. 15-cv-7280, 2017 U.S. Dist. LEXIS 110640, at *27 n.13 (S.D.N.Y. July 17, 2017) (Berman, J.):

**The Court**: OK. I found this discussion about how police have been trained since the 70s to be interesting at the very least. So one of your [Defendants' Counsel's] clients was asked: Do civilians have the right to film the police? And he

answered "yes." Then he is asked: And I believe you said that the NYPD has been

training its members at the academy of these rights since the 70s. And he answered

"yes." And the next question was: And that everybody who has become a member

of the service for the NYPD since the 70s has been trained that civilians have the

right to film the police. Answer: Yes. And question: Where does that right come

from? Answer: First amendment.

153.    In this District, Judge Richard Berman has found that the right to film and record

the police has likely been clearly established since at least September 17, 2012. *Gerskovich,* 2017

U.S. Dist. LEXIS 110640, at *25. Judge Castel similarly found that the right of a journalist to

record police activity was clearly established as of November 15, 2011. *Higginbotham v. City of*

*NY,* 105 F.Supp.3d 369 (S.D.N.Y. 2015). In the Eastern District of New York, Judge Townes found

that whether this right has clearly been established since June 5, 2012 was a fact specific question

for the jury. *Charles v. City of New York*, No. 12-cv-6180, 2017 U.S. Dist. LEXIS 17943, at *64-

65 (E.D.N.Y. Feb. 7, 2017).

154.    On October 9, 2014, the NYCLU sent a letter to NYPD Commissioner Bratton

alerting the NYPD that NYPD School Safety Agents had interfered with and prevented a New

York One journalist from videotaping students and School Safety Agents in front of a school.[14]

155.    The October 9, 2014 letter informed the NYPD of an incident in which a journalist

was standing on a public sidewalk across the street from a school and filming an interaction

between students and School Safety Agents in front of the school. At this time, a Safety Agent

ordered the journalist to stop filming; when the journalist objected, the Safety Agent broke the lens

---

[14] *See* NYCLU letter dated 10/9/14, attached hereto as Exhibit G.

guard off of the camera and then covered the lens with her hat, preventing the journalist from filming.

156.    The October 9, 2014 letter informed the NYPD of at least two additional and similar incidents involving NYPD officers preventing New York One journalists from reporting in front of schools.

157.    The October 9, 2014 letter further informed the NYPD that these incidents raised "a crucial need to train School Safety Agents in their obligations to respect First Amendment rights on the public sidewalk."

158.    Upon information and belief, the NYPD took no substantive action in response to the incidents described in the October 9, 2014 letter.

159.    At least since 2012, the City of New York was on notice that there may be a significant problem with the NYPD's failure to train its officers to respect the right to photograph or film police activity in public.[15]

160.    After the court in *Charles v. City of New York* denied most of the City's summary judgment motion, *Monell* discovery was then ordered to be produced within sixty days. Minute Entry of Mar. 7, 2017, *Charles v. City of New York,* No. 12-cv-6180 (No. 124).

161.    Rather than produce the ordered *Monell* discovery, more than four years after the *Charles* suit was filed, the City quickly settled the *Charles* litigation.  Letter to Judge Townes with Stipulation of Settlement and Order of Dismissal, *Charles v. City of New York,* No. 12-cv-6180 (No. 127).

---

[15] *See, e.g.*, New York Civil Liberties Union, *NYCLU Lawsuit Challenges NYPD Arrest of Brooklyn Woman for Filming Stop-and-Frisk* (Dec. 17, 2012), https://www.nyclu.org/en/press-releases/nyclu-lawsuit-challenges-nypd-arrest-brooklyn-woman-filming-stop-and-frisk (regarding filing of *Charles v. City of New York* in the Eastern District).

36

162.    Another manner in which the NYPD disregards the rights of photographers concerns the pattern of NYPD officers confiscating press passes from professional journalists.

163.    For example, on numerous occasions, J.B. Nicholas, a professional photojournalist with an NYPD-issued press pass, has had his pass confiscated by NYPD officers while photographing police activity without interfering or endangering an officer or anyone else. These include, among other instances, a 2007 incident at Yankee Stadium; a July 2014 incident at the Broadway-Lafayette subway station; and a 2015 incident at the scene of a building collapse in midtown.

164.    During the July 2014 incident, while Mr. Nicholas was attempting to take a photograph, an NYPD officer told him that he would be arrested if he did not leave the station platform. At the same time, bystanders were allowed to remain on the platform.

165.    Mr. Nicholas has been arrested several times while performing his job as a credentialed photojournalist with an NYPD-issued press pass.

166.    Mr. Nicholas was also arrested while photographing paramedics in 2013. He was acquitted following the trial of those charges.

167.    Similarly, Mr. Nicholas was arrested in 2014 while attempting to photograph NFL Commissioner Roger Goodell. All charges were dropped against him.

168.    Regulations state that the NYPD must hold a hearing to revoke a journalist's press credentials. In a hearing related to a suit brought by Mr. Nicholas, an attorney for Defendant CITY stated to federal Judge J. Paul Oetken that he was unaware whether such hearings are held.

169.    Upon information and belief, the NYPD was aware of this pattern of police interference but has taken no substantive action in response.

170.     In a report published in June 2017, the CCRB identified that it had substantiated 96 cases of police interference with civilians recording police activity between January 1, 2014 and December 31, 2016. The CCRB substantiated cases involving improper threats to arrest people recording police activity; use of physical force to improperly prevent the recording of police activity; improper use of force in retaliation for having recorded police activity; improper blocking and prevention of civilians attempting to record police activity; improper searching of recording devices for recordings of police activity; improper deletion of recordings of police activity; intentional damage and destruction of recording devices; and arrest and issuance of summonses in retaliation for civilian recording of police activity. The CCRB report concluded, that "even with its limitations, the data supports the conclusion that officer interference with civilian recordings of police conduct is an issue in New York City."

171.     Upon information and belief, the NYPD has taken no substantive action in response to the cases substantiated by the CCRB.

### Facts Relating to Defendants CITY, D'ADAMO, McNAMARA, and PURTELL's Deliberate Indifference to Conduct of Defendant LOMBARDO

172.     Defendant CITY has waited too long or failed to properly discipline and supervise Defendant LOMBARDO even though it has known that such discipline and supervision is necessary to prevent the further violation of constitutional rights of people of the City of New York.

173.     Defendant LOMBARDO has been the subject of various misconduct allegations and complaints, including unlawful arrest and excessive force during improper arrests. This includes but is not limited to a complaint filed by attorney M.J. Williams with the CCRB accusing LOMBARDO of using excessive force, punching her and accidentally brushing her breast as he and other officers arrested her (this incident occurred after the arrest of Mr. Nigro).

174.    Defendant LOMBARDO has been named as a defendant in at least three lawsuits alleging that he committed constitutional violations as an NYPD Officer.

    a.    *Adsluf v. City of New York, et al*, 13-CV-2295-LGS (S.D.N.Y.).

    b.    *Lynch v. City of New York, et al*, 16-CV-7355-LAP (S.D.N.Y.).

    c.    *Ledlum v. City of New York, et al*, 07-CV-107-RRM-JMA (S.D.N.Y.).

175.    In addition to these lawsuits and internal investigations, complaints about Defendant LOMBARDO have been reported publicly since at least 2011.

176.    Defendant LOMBARDO has been named as the NYPD's Most Notorious Anti-Activist Cop.[16]

177.    At other times, Defendant LOMBARDO has been caught on camera using vulgar language threatening peaceful activists. *See, e.g.*, https://www.youtube.com/watch?v=2xN3e-xXtXw (around 2:25, Defendant LOMBARDO can be heard stating, "Close your fucking face, I'm going to find 20 fucking things to put you in jail, don't be an asshole.").

178.    On or about September 23, 2015, it was publicly reported, via Twitter, that Defendant LOMBARDO had threatened Copwatch activist Jose LaSalle by telling him, "I'm going to take you somewhere no one can find you." Making good on this promise, Defendant LOMBARDO then arrested Mr. LaSalle and drove him to a precinct far from the arrest location.

179.    In fact, members of Copwatch and other activists have relayed to the plaintiff that Defendant LOMBARDO had mentioned Plaintiff and that his arrest was a targeted one.

180.    Despite these various complaints against Defendant LOMBARDO, both publicly and via litigation, Defendant LOMBARDO has been repeatedly promoted, including to Captain in 2011 and to Deputy Inspector in 2015.

---

[16] Johnson, *supra* note 5.

181.   At the time relevant to the incident underlying this complaint, Defendants D'ADAMO, McNAMARA, and PURTELL were each supervisors of Defendant LOMBARDO, either direct supervisors or, supervisors of a supervisor of Defendant LOMBARDO.

182.   The injuries suffered by Plaintiff Nigro are the result of Defendants CITY, D'ADAMO, McNAMARA, and PURTELL's failure to properly supervise and discipline Defendant LOMBARDO or waiting too long to properly supervise and discipline Defendant LOMBARDO.

183.   In fact, both Defendant McNAMARA and PURTELL have been sued for violating the constitutional rights of individuals and making false arrests at protest.[17] Defendant D'ADAMO has been sued for failing to properly supervise and stop a false arrest as an Executive Officer of the NYPD.[18]

## VII. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### FALSE ARREST UNDER 42 U.S.C. § 1983
### (AGAINST DEFENDANTS LOMBARDO, ANIANO, AND JOHN DOES)

184.   Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs.

185.   Plaintiff was arrested by the Defendant POLICE OFFICERS without probable cause, without a warrant, and without Plaintiff's consent.

---

[17] See *Koznar v. City of New York,* 15-cv-1484 (S.D.N.Y.) (Suit naming McNamara as a defendant for directing false arrest of individual in and around Zuccotti Park on February 29, 20120); *Boss v. City of New York*, 12-cv-8728 (S.D.N.Y.) (Suit naming Purtell as a defendant for tackling, kneeing and falsely arresting a journalist named Joshua Boss on December 17, 2011).

[18] See *Adsluf v. City of New York, et al*, 13-cv-2295 (S.D.N.Y.); *Trujillo v. City of New York*, 14-cv-08501 (S.D.N.Y.).

186.     In particular, the Defendant POLICE OFFICERS, including LOMBARDO and ANIANO seized Plaintiff.

187.     The Defendant POLICE OFFICERS unlawfully detained Plaintiff in their custody for approximately six (6) hours on March 19, 2016.

188.     On or about May 2, 2016, Mr. Nigro was required to appear at court to answer the charge made against him.

189.     At that appearance, the New York County District Attorney's Office offered Mr. Nigro adjournment in contemplation of dismissal of said charge.

190.     Mr. Nigro accepted that offer and the charge was thus dismissed on or about November 1, 2016.

191.     As a result of the Defendants' impermissible conduct, Plaintiff suffered damages as alleged and demands judgment against the Defendants in an amount to be determined at trial, along with punitive damages, together with attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF FIRST AMENDMENT RIGHT OF FREEDOM OF PRESS**
**UNDER 42 U.S.C. § 1983 (AGAINST ALL DEFENDANTS)**

192.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs.

193.     Plaintiff and other working media, specifically photographers, have been prevented by NYPD officers from observing, recording and reporting on protest activities and police response to said activities.

194.     On the date of arrest, Plaintiff was forcibly removed, stopped from engaging in Protected Activity, and arrested by Defendant NYPD officers from the scene of police actions against protesters for no lawful purpose.

195.    In addition, Plaintiff has alleged herein that he, and other members of the press are routinely targeted by police officers for arrest and harassment to deter them from recording and observing police activity, including police efforts to chill political protest.

196.    Furthermore, the unlawful interference with Protected Activity and prevention of coverage by Plaintiff of the protest and related police activity on the date of arrest violated Plaintiff's First Amendment rights.

197.    As a result of Defendants' conduct, Plaintiff was injured financially as he could no longer shoot the event that day and could not get the photos he did take uploaded to his agents in a timely manner.

198.    Defendants have deprived Plaintiff of his civil, constitutional, and statutory rights and have conspired to deprive him of such rights and are liable to Plaintiff under 42 USC § 1983.

199.    As a result of the Defendants' impermissible conduct, Plaintiff suffered damages as alleged and demands judgment against the Defendants in an amount to be determined at trial, along with punitive damages, together with attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
### FIRST AMENDMENT RETALIATION ARREST
### UNDER 42 U.S.C. § 1983 (AGAINST DEFENDANT LOMBARDO)

200.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

201.    On the date and time of his arrest, Plaintiff was engaged in Protected Activity as working media observing, recording and reporting on protest activities and police response to said activities.

202.    On the date of arrest, Plaintiff was forcibly removed, arrested and stopped from engaging in Protected Activity, arrested by Defendant NYPD officers from the scene of police

actions against protesters for no lawful purpose.

203.    Plaintiff was forcibly removed and stopped from engaging in the Protected Activity because he was taking photographs of the police interactions with protesters and documenting the NYPD conduct of that day.

204.    Plaintiff was not the only photographer arrested, on March 19, 2016, who was documenting the police interactions with protesters and documenting the NYPD conduct of that day.

205.    Plaintiff was forcibly removed and stopped from engaging in the Protected Activity by Defendant LOMBARDO in retaliation for Plaintiff having previously taken photographs of Defendant LOMBARDO and publishing them, including the photograph in paragraph 42, *supra*.

206.    Defendant LOMBARDO bypassed numerous individuals in the street and on the sidewalk in locating, detaining and arresting Plaintiff.

207.    Defendant LOMBARDO has been known to identify individuals he interacts with on the street and conduct some fact-finding investigation to learn more about that person. An example of this conduct is documented in paragraph 69.

208.    Plaintiff was harmed by this arrest as it removed him from the protest and deprived him of being able to document and cover the protest and related police activity.

209.    As a result of Defendants' conduct, Plaintiff was also harmed financially as he could no longer shoot the event that day and could not get the photos he did take uploaded to his agents in a timely manner.

210.    Defendants have retaliated against Plaintiff and deprived him of his civil, Constitutional and statutory rights and are liable to Plaintiff under 42 USC § 1983.

211.    As a result, Plaintiff has been injured.

## FOURTH CLAIM FOR RELIEF
### *MONELL* CLAIM UNDER 42 U.S.C. § 1983
### (AGAINST DEFENDANT CITY OF NEW YORK)

212.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

213.    All of the acts and omissions by the individual defendants described above were carried out pursuant to policies and practices of the Defendant CITY which were in existence on March 19, 2016 and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant CITY and its agency, the NYPD, and Supervising Defendants.

214.    Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts and omissions; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

215.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the Defendant CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

216.    The aforementioned customs, practices, procedures and rules of Defendant CITY and the NYPD include, but are not limited to, (i) arresting individuals in retaliation for reporting on, photographing or otherwise documenting the conduct of government actors, particularly police officers; and (ii) arresting members of the press attempting to document protests or other police activity; and (iii) failing to properly train officers in rights of media, specifically photographers with or without NYPD issued credentials.

217.    The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the paragraphs above, that include, but are not limited to the following incidents and events:

a.      May 30, 2007: A Manhattan photographer, Robert Carneval, was arrested after filming NYPD officers as they seized and loaded bicycles, which had been locked to lampposts and parking meters, into a police van. After the photographer began filming and discussing the seizure with an onlooker, a plainclothes officer asked him for identification. When the photographer stated he had the right to film, the officer led him to a police car, examined his identification, then arrested him.

b.      September 24, 2011: A journalist states that NYPD officers threw him against a wall while he was attempting to interview protesters. The journalist claimed that at the time of this incident he was holding a microphone and was wearing a badge that identified him as press.

c.      September 24, 2011: A journalist who had been arrested at a protest reported that while he was in NYPD custody that he met a woman who was arrested after she took a picture of the same protest.

d.      October 14, 2011: A journalist stated he was struck in the shoulder while taking a video without warning by an NYPD detective wearing a suit.

e.      November 15, 2011: A reporter stated that she witnessed NYPD officers throwing another reporter in a choke-hold at a protest and witnessed other NYPD officers at the same protest failing to distinguish between press and protesters.

f.      November 17, 2011: A reporter, who claimed she was visibly wearing a press pass at the time of the incident, stated that an NYPD officer struck her in the arm with a baton as she attempted to film officers as they were pushing a barricade into protesters.

g.      November 17, 2011: A reporter stated that another reporter covering a protest was slammed against a wall, arrested, and removed from the protest in handcuffs.

h.      November 2011: Several news and media organizations, including *The New York Times, the New York Post, the New York Daily News, the Associated Press,* NBC Universal and WNBC-TV, WCBS-TV, WABC-TV, and *Thomson Reuters*, wrote a letter to the NYPD to complain about deteriorating NYPD-press relations in light of NYPD's arrests of, physical assault of, and interference with or obstruction of journalists covering protests.

i.      November 23, 2011: NYPD issued a Finest Message to its members of service reminding them of their obligation to cooperate with media representatives

acting in a news-gathering capacity at the scene of police incidents, citing to provisions in the NYPD Patrol Guide requiring said cooperation.

j.      December 12, 2011: Citizen reporters, who were documenting a police response to a protest in the Winter Garden of One Financial Center were grabbed, pulled to the ground, and arrested without warning or probable cause by NYPD officers.

k.      December 17, 2011: A journalist witnessed an NYPD officer punch his colleague, a credentialed cameraman, three times in the kidney.

l.      February 2, 2012: Several news organizations sent another letter to the NYPD objecting to the continued mistreatment of the press by the NYPD.

m.      March 2012: A cameraman from WABC-TV was struck by an NYPD officer for unknown reasons while the photographer was reporting at a crime scene.

n.      August 12, 2012: Photographer Robert Stolarik with *The New York Times*, was arrested by NYPD officers and charged with obstructing government administration and resisting arrest after taking photographs of a brewing street fight in the Bronx. Mr. Stolarik was taking photographs of the arrest of a teenage girl, when a police officer instructed him to stop doing so. Mr. Storlarik said he identified himself as a journalist for *The New York Times* and continued taking photographs. A second officers appeared, grabbed Mr. Stolarik's camera and slammed it into Mr. Stolarik's face in the course of arresting him. The NYPD who alleged that Mr. Stolarik was interfering with the arrest was later convicted of lying under oath.

o.      September 15-17, 2012: Five photojournalists reporting on protests were arrested by NYPD officers at the time the photojournalists were in the course of news-gathering. One photographer was arrested after attempting to take a picture of an NYPD officer giving a dispersal order on a sidewalk. An NYPD officer forced another photojournalist to the ground and detained him, while a Lieutenant in NYPD's Legal Bureau shoved and blocked another photographer from taking a photo.

p.      September 17, 2012: Journalist Christopher Faraone was photographing a protest when NYPD officers tackled, battered, and arrested him. One of the officers allegedly directed Mr. Faraone to cease his news reporting activities within New York City.

q.      October 12, 2012: Thirteen news organizations again sent a letter to the NYPD complaining of NYPD's continued mistreatment of the press covering protests and specifically citing the arrests, detention, and mistreatment of photographers and reporters covering demonstrations.

r.      November 27, 2012: Photographer Angel Zayas was arrested while photographing NYPD officers making an arrest in Grand Central Terminal.

s.      January 16, 2013: A photographer from VIN News had his camera seized and thrown to the ground, the camera's memory card erased, and his smartphone damaged by NYPD officers because he had been photographing the officers stopping and frisking teenagers. The photographer was also handcuffed and held up against a wall by NYPD officers before he was released with a warning.

t.      April 19, 2013: A film student was arrested while filming the exterior of an NYPD precinct. The officers confiscated the photographer's cell phone, camera, and the camera's memory card.

u.      March 16, 2013: Journalist Ed Garcia Conde, who writes for the Welcome 2 Melrose blog, video recorded an interaction between an NYPD officer. The NYPD officer asked Mr. Conde to stop videotaping, and when Mr. Conde refused, the NYPD officer arrested him and issued him two summonses.

v.      September 17, 2014: Photojournalist Jason B. Nicholas was on assignment for the *New York Daily News* to photograph the Commissioner of the National Football League. Mr. Nicholas was violently assaulted by the Commissioner's bodyguard while he was taking photographs. NYPD officers responding to the scene arrested Mr. Nicholas and charged him for assaulting the bodyguard.

218.    By March 2016, Defendant CITY OF NEW YORK knew or should have known that members of its police force would encounter members of the media, particularly photographers with or without NYPD issued press credentials, seeking to document, via photography and other means, police incidents involving the general public and that its employees, members of the NYPD were not sufficiently trained in how to handle media at such police incidents.[19]

219.    In a meeting in August 2011, a high-ranking member of the NYPD admitted that such training would be beneficial.

220.    Numerous notices of improper policing of media were provided to the NYPD.

---

[19] Even as recently as 9/14/18, the NYPD acknowledged the need for further training regarding press police relations in its Finest Message issued that "strongly urged [NYPD officers] to review patrol guide procedure 212-49, 'Incidents Involving Media Representatives,' which directs that [NYPD officers] not interfere with photographing or videotaping by properly credential members of the press."  See Finest Message dated 9/14/18 attached hereto as Exhibit H.

221.    Nonetheless, the CITY OF NEW YORK, Commissioner of the NYPD, Mayor of the City of New York, and the Supervising Defendants made deliberate choices not to provide adequate training to NYPD police officers in dealing with members of the media, and particularly photographers.

222.    Proper training in following the appropriate police directives, FINEST messages, and Patrol Guides in how to deal with members of the media, particularly photographers with or without NYPD issued press credentials, and the right of anyone to photograph police interactions with the general public would have avoided the arrest of Plaintiff Nigro.

223.    The inadequacy of training was highlighted by various letters and communications from various social justice organizations, law schools and members of the media to the NYPD, including as documented in the paragraphs above.

224.    At least from the time of Occupy Wall Street, the CITY OF NEW YORK understood that the NYPD's treatment of members of the media, particularly photographers with or without NYPD issued press credentials, was inconsistent with its own guidelines and directives, and the need for training was obvious.

225.    The CITY OF NEW YORK failed to train the individual street level police officers on the proper treatment of members of the media, particularly photographers with or without NYPD issued press credentials who were documenting incidents and interactions between the NYPD and members of the public.

226.    The CITY OF NEW YORK  failed to train the individual street level police officers on the rights of members of the media, particularly photographers with or without NYPD issued press credentials, who were documenting incidents and interactions between the NYPD and members of the public.

227.   The CITY OF NEW YORK showed deliberate indifference to the rights of members of the media, particularly photographers with or without NYPD issued press credentials, who were documenting incidents and interactions between the NYPD and members of the public by failing to properly train these police officers, including defendant Officers LOMBARDO and ANIANO.

228.   The CITY OF NEW YORK showed deliberate indifference to the rights of members of the media, particularly photographers with or without NYPD issued press credentials, who were documenting incidents and interactions between the NYPD and members of the public by failing to properly supervise these police officers, including defendant Officers LOMBARDO and ANIANO.

229.   At all relevant times herein, Defendant CITY OF NEW YORK established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiff's constitutional rights granted pursuant to 42 U.S.C. § 1983, as well as the case of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), including those under the First, Fourth, and Fourteenth Amendments.  All of the aforementioned acts of the Supervising Defendants, their agents, servants and employees, were carried out under the color of state law.

230.   The CITY OF NEW YORK at all times leading up to the arrest date in March 2016, had a duty to the Plaintiff and the citizens and residents of the City of New York to make the appropriate choice among many to (1) establish, implement and follow policies, procedures, customs, and or practices which conform to and provide for the protections guaranteed to Plaintiff under the United States Constitution, including the First, Fourth, and Fourteenth Amendment; (2) select, supervise, train, control, and review the activities of all agents, servants, employees, and

49

police officers in their employ, and (3) refrain from deliberate indifference to the Constitutional rights of the Plaintiff so as to not cause him injuries and damages alleged herein.

231.   The CITY OF NEW YORK breached their duties and obligations to the Plaintiff by making the wrong choice by; (1) failing to establish, implement, and follow the correct Constitutional policies, procedures, customs, and/or practices; (2) failing to properly select, supervise, train, control, and review the activities of their agents, servants, employees, and police officers as to their compliance with Constitutional safeguards; (3) permitting their agents, servants, employees, and police officers to engage in the unlawful and unconstitutional conduct alleged herein; and (4) exercising, at a minimum, deliberate indifference towards the Constitutional protections afforded to the Plaintiff by disregarding the numerous communications, public reports, meetings and official complaints indicating that the policies, procedures, customs, and/or practices were improper and violated the Plaintiff and other photographers Constitutional rights.

232.   Furthermore, the members of the NYPD carried out the alleged conduct in their capacities as police officers and under the color of state law, pursuant to the policies, procedures, customs, and/or practices of the Defendants, the CITY OF NEW YORK and the NYPD, all under the supervision of the Supervising Defendants, the Mayor of the City of New York and the NYPD Police Commissioner.

233.   Defendant CITY knew, or should have known, that by making the wrong choice that it was foreseeable it would and did cause photographers, including Plaintiff, to be injured and damaged as a result of the constitutionally impermissible conduct undertaken pursuant to the policies, procedures, customs, and/or practices, and that such decisions occurred in contravention of public policy and their legal duties and obligations to Plaintiff and other members of the media, including photographers.

234.    The decisions, actions, and inactions, of Defendant CITY and its agents are the legal cause of injuries to Plaintiff as alleged herein and, as a result, Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

235.    Additionally, in light of the ongoing and continuing nature of Defendant CITY's pattern and practice of targeting media individuals, including photographers like Plaintiff, in violation of their constitutional rights, injunctive relief is warranted to prevent future violations.

**FIFTH CLAIM FOR RELIEF**
**DELIBERATE INDIFFERENCE UNDER 42 U.S.C. § 1983**
**(AGAINST DEFENDANTS CITY OF NEW YORK, D'ADAMO, MCNAMARA,**
**PURTELL, AND RICHARD ROES)**

236.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

237.    The CITY OF NEW YORK, acting through the New York City Police Department and its agents, officers, and employees, has acted with deliberate indifference to the rights of the people of the City of New York to not be subjected to unconstitutional conduct by Defendant LOMBARDO.

238.    Defendants D'ADAMO, McNAMARA, and PURTELL, and other supervising officers either failed, or waited too long, to properly discipline and supervise Defendant LOMBARDO and have therefore acted with deliberate indifference to the rights of the people of the City of New York to not be subjected to unconstitutional conduct by Defendant LOMBARDO.

239.    Despite its awareness of numerous complaints, lawsuits and negative public reports concerning the misconduct of Defendant LOMBARDO, the City, Defendants D'ADAMO, McNAMARA, and PURTELL and the NYPD have remained indifferent and either failed, or

waited too long, to adequately supervise or discipline Defendant LOMBARDO to ensure that he does not violate the constitutional rights of people of the City of New York.

240.    The City and Defendants D'ADAMO, McNAMARA, and PURTELL's deliberate indifference was the moving force of the Plaintiff's injuries.

241.    As a result of the Defendants' impermissible conduct, Plaintiff suffered damages as alleged and demands judgment against the Defendants in an amount to be determined at trial, along with punitive damages, together with attorneys' fees and costs.

242.    Additionally, in light of the ongoing and continuing nature of Defendants' pattern and practice of deliberate indifference to the violation of the constitutional rights of media individuals, including photographers like Plaintiff, injunctive relief is warranted to prevent future violations.

**SIXTH CLAIM FOR RELIEF**
**DEPRIVATION OF FAIR TRIAL UNDER 42 U.S.C. § 1983**
**(AGAINST DEFENDANTS LOMBARDO AND ANIANO)**

243.    The Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

244.    Individual Defendants LOMBARDO and ANIANO created false evidence against Plaintiff Michael Nigro, creating or providing false evidence to prosecutors in the New York County District Attorney's Office.

245.    In creating false evidence against Plaintiff, and in forwarding false information to prosecutors, individual Defendants violated Plaintiff's right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

246.    Among the false statements forwarded to the prosecutors was the failure to identify the Plaintiff as working press and professional photographer.

247.    Among the false statements forwarded to the prosecutors was the statement concerning the location of the arrest of the plaintiff, as he was arrested on the sidewalk.

248.    Among the false statements forwarded to the prosecutors was that Defendant ANIANO observed the plaintiff enter the street.

249.    Among the false statements forwarded to the prosecuters was that Plaintiff walked past metal barricades.

250.    Among the false statements forwarded to the prosecutors was the statement that Plaintiff was "block[ing] vehicle traffic."

251.    As a consequence, thereof, Plaintiff has suffered harms, including deprivation of liberty.

252.    As a result of the Defendants' impermissible conduct, Plaintiff suffered damages as alleged and demands judgment against the Defendants in an amount to be determined at trial, along with punitive damages, together with attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

a.    Invoke pendent party and pendent claim jurisdiction;

b.    Issue a permanent injunction enjoining Defendants from improperly preventing press access to NYPD incidents in connection with public speech, protest, and assembly;

c.    Direct Defendants to implement appropriate training for all members of the NYPD regarding policing media at police incidents;

d.    Issue a Declaratory judgment declaring the complained of conduct to be unlawful;

e.    Award appropriate compensatory and punitive damages;

g.    Award attorneys' fees and costs; and

      h.     Award such other and further relief as the Court deems to be in the interest of justice.

DATED:     New York, New York
               October 25, 2019

Respectfully submitted,


___*/s/Wylie Stecklow*_____       _*/s/Kim E. Richman*_____
Wylie Stecklow                          Kim E. Richman
WYLIE STECKLOW PLLC            RICHMAN LAW GROUP
233 Broadway, Suite 820              8 W. 126th Street
New York, New York 10279           New York, New York 10027
(212) 566-8000                          (718) 705-4579
wylie@wylielaw.com                 krichman@richmanlawgroup.com


*Attorneys for Plaintiff*